743 S.E.2d 258

Bernadette R. HAMPTON, Jackie B. Hicks and
Carlton B. Washington, Petitioner,

v.

The Honorable Nikki HALEY, in her official capacity as Governor of South Carolina, The Honorable Richard Eckstrom, in his official capacity as Comptroller General for the State of South Carolina, The Honorable Curtis Loftis, in his official capacity as Treasurer of the State of South Carolina, and The South Carolina Budget and Control Board, Respondents.

Appellate Case No. 2012–212723.

No. 27244.

Supreme Court of South Carolina.

Heard Jan. 23, 2013.

Refiled May 8, 2013.

W. Allen Nickles, III, of Nickles Law Firm, LLC, of Columbia, for Petitioners.

C. Mitchell Brown, William C. Wood, Jr., and Michael J. Anzelmo, of Nelson, Mullins, Riley, & Scarborough, LLP, of Columbia, for Respondents.

John S. Nichols, of Bluestein, Nichols, Thompson and Delgado, of Columbia, for Amicus Curiae, State Retirees Association of South Carolina.

Justice HEARN.

At its most basic level, this case presents a policy dispute: whose policy choice concerning health insurance premiums for State employees controls—the General Assembly's or the Budget and Control Board's? While policy decisions are matters left to the political branches, this Court is tasked with maintaining and enforcing the constitutional and statutory framework through which such issues must be resolved. We find that under the South Carolina Constitution, the General Assembly had and exercised the power to determine the contribution rates of enrollees for the State's health insurance

plan in 2013. We hold the Budget and Control Board violated the separation of powers provision by substituting its own policy for that of the General Assembly, enter judgment for the petitioners, and direct the Board to use the appropriated funds for premium increases.

## FACTUAL/PROCEDURAL BACKGROUND

### I. THE STATE HEALTH PLAN

The State provides its employees and certain other persons with health insurance through a statewide, group health insurance plan (the Plan). The persons eligible for participation in the Plan, as set forth in Section 1–11–720 of the South Carolina Code (2005 & Supp.2012), consist of State employees and retirees, their spouses and dependents, and employees of numerous statutorily specified entities, including for example, counties, municipalities, and private organizations.

Prior to 1992, the Budget and Control Board received authority yearly to administer the Plan through the annual appropriations act. In 1992, the General Assembly enacted Section 1–11–710 of the South Carolina Code, codifying the Board's authority to administer the plan. As it existed prior to 2012, section 1–11–710 provided in relevant parts:

(A) The State Budget and Control Board shall:

(1) make available to active and retired employees of this State and its public school districts and their eligible dependents group health, dental, life, accidental death and dismemberment, and disability insurance plans and benefits in an equitable manner and of maximum benefit to those covered within the available resources.

(2) approve by August fifteenth of each year a plan of benefits, eligibility, and employer, employee, retiree, and dependent contributions for the next calendar year. The board shall devise a plan for the method and schedule of payment for the employer and employee share of contributions. . . .

The amounts appropriated in this section shall constitute the State's pro rata contributions to these programs. . . .

(3) adjust the plan, benefits, or contributions, at any time to insure the fiscal stability of the system.

(4) set aside in separate continuing accounts in the State Treasury, appropriately identified, all funds, state-appropriated and other, received for actual health and dental insurance premiums due. Funds credited to these accounts may be used to pay the costs of administering the health and dental insurance programs and may not be used for purposes of other than providing insurance benefits for employees and retirees. A reserve equal to not less than an average of one and one-half months' claims must be maintained in the accounts and all funds in excess of the reserve must be used to reduce premium rates or improve or expand benefits and funding permits.

. . . .

On June 26, 2012, Act No. 278 was enacted, creating the South Carolina Public Employee Benefit Authority (PEBA) as codified at Section 9–4–10, *et seq.* of the South Carolina Code (Supp.2012), and amending section 1–11–710 by transferring the Board's powers and duties under that statute to PEBA.[1] Additionally, the Act made PEBA's decisions subject to approval by a majority vote of the Board as set forth in Section 9–4–45 of the South Carolina Code (Supp.2012). The Act took effect July 1, 2012, and thus, as of that date, PEBA exercises the powers formerly exercised by the Board in relation to the Plan, and the Board has a veto power over PEBA's decisions.

Although nine of PEBA's eleven members had been appointed on or before the August 15th deadline for setting the yearly terms of the Plan as specified in section 1–11–710, only two members had taken the oath of office and only one member had filed his statement of economic interests on or before that deadline.

## II. THE 2012 BUDGET PROCESS AND THE PLAN

The State's budget and the Plan's budget operate on different timetables because the State's fiscal year runs from July 1

---

1. The Act substituted "Board of Directors of the South Carolina Public Employee Benefit Authority" for "State Budget and Control Board" in subsection 9 of the definitions provision of Article 5, Section 1–11–703 of the South Carolina Code. S.C.Code Ann. § 1–11–703 (Supp.2012). The Act also substituted "board" for "State Budget and Control board" in subsection A of section 1–11–710. S.C.Code Ann. § 1–11–710 (Supp. 2012).

to June 30, whereas the Plan's fiscal year runs from January 1 to December 31. For that reason, in addition to any premium increases the General Assembly decides the State must cover in the upcoming Plan year, the State's budget each year must also cover the last six months of the insurance premium increases set by the Board on August 15th of the previous year, an amount known as the "annualization."

Employees covered by the Plan are split into "general fund employees" and "non-general fund employees." General fund employees consist of State and school district employees, and the premiums borne by the State through general fund appropriations cover these employees. *See* S.C.Code Ann. § 1–11–710. For fiscal year 2012–2013, general fund employees constituted 51.6% of the Plan's enrollees. Non-general fund employees work for those entities specified in section 1–11–720, and if an employer entity chooses to provide insurance to its employees through the Plan, the employer is responsible for paying the employer portion of the premiums—the portion borne by the State for general fund employees. S.C.Code Ann. § 1–11–720.

In November 2011, the Board produced a memorandum informing the General Assembly of the Plan's needs in relation to the State's budget for fiscal year 2012–2013. The memorandum stated the Plan required an annualization of $14.264 million and $15.767 million to cover new, general fund retirees. Also, the Plan's insurance premiums had increased over the past year by $79,705,991. Thus, to cover the premium increases for the first six months of the Plan's fiscal year, the Plan required $39,852,996. Removing the portion attributable to non-general fund employees, the Plan required a premium increase of $20,564,146 for general fund employees.

The memorandum presented the General Assembly with three options for dividing the premium increases between the State and enrollees. First, the General Assembly could split the premium increases evenly between the State and enrollees which would require an appropriation of $14.487 million for premium increases, and when combined with the annualization and new retiree costs would necessitate a total appropriation of $44.878 million. Second, the General Assembly could place the entire premium increase on the State which would require

an appropriation of $20.564 million, and when combined with the annualization and new retiree costs would necessitate a total appropriation of $50.595 million. Third, the General Assembly could place the entire premium increase on the enrollees which would only require appropriations for the annualization and new retiree costs, for a total appropriation of $30.031 million.

On August 3, 2012, the 2012–2013 Appropriations Act was enacted.[2] In Section 80C under a heading for State employee benefits, and a subheading for rate increases, the General Assembly appropriated $51,528,219 for health insurance employer contributions.

On August 8, 2012, the Board convened and considered the Plan's benefits and contribution rates for 2013. First, the Board discussed what powers it possessed after the creation of PEBA and concluded the Board served in a de facto capacity for PEBA because it did not yet exist. In the discussion of contribution rates that followed, all of the members of the Board acknowledged the General Assembly fully funded the premium increases such that enrollees would not bear any of the increases. However, by a three-to-two vote, the Board decided to split the premium increase equally between the State and enrollees.

## III. PROCEDURAL HISTORY

Petitioners Bernadette Hampton, Jackie Hicks, and Carlton Washington filed a petition for original jurisdiction and a complaint with this Court challenging the Board's decision. Hampton is Vice–President of the South Carolina Education Association, Hicks is President of the South Carolina Education Association, and Washington is Executive Director of the South Carolina State Employees Association. The petitioners all participate in the Plan's health insurance by virtue of their employment.

## ISSUES PRESENTED

I. Did respondents violate the separation of powers required by the South Carolina Constitution?

---

**2.** *See* South Carolina Legislature, 2012–2013 Appropriations Bill H. 4813, http://www.scstatehouse.gov/sess119_2011-2012/appropriations 2012/ta12ndx.php.

**II.** Did the General Assembly unconstitutionally delegate legislative authority to the Board to unilaterally increase Plan premiums?

**III.** Is the challenged conduct subject to an injunction and mandatory reimbursement of premium increases to enrollees?

## LAW/ANALYSIS

### I. SEPARATION OF POWERS

The petitioners argue the Board did not have the power, except in limited circumstances not applicable here, to raise premiums for enrollees. They contend that the Board thus violated the separation of powers required by the South Carolina Constitution because it substituted its policy choices for those enacted by the General Assembly. We agree.

The South Carolina Constitution establishes three branches of government and requires they be "forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other." S.C. Const. art. I, § 8. This mandate of a separation of powers stems from "the desirability of spreading out the authority for the operation of the government. It prevents the concentration of power in the hands of too few, and provides a system of checks and balances." *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982).

At its simplest, the constitutional division of powers can be described as "[t]he legislative department makes the laws; the executive department carries the laws into effect, and the judicial department interprets and declares the laws." *State ex rel. McLeod v. Yonce*, 274 S.C. 81, 84, 261 S.E.2d 303, 305 (1979). In our division of powers, the General Assembly has plenary power over all legislative matters unless limited by some constitutional provision. *Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 438–39, 181 S.E. 481, 486 (1935). Included within the legislative power is the sole prerogative to make policy decisions; to exercise discretion as to what the law will be. *State v. Moorer*, 152 S.C. 455, 479, 150 S.E. 269, 277 (1929); *Sutton v. Catawba Power Co.*, 101 S.C. 154, 157, 85

S.E. 409, 410 (1915). The executive branch is constitutionally tasked with ensuring "that the laws be faithfully executed." S.C. Const. art. IV, § 15. Of course, the executive branch, including the Board, may exercise discretion in executing the laws, but only that discretion given by the legislature. *See Moorer,* 152 S.C. at 478, 150 S.E. at 277. Thus, while non-legislative bodies may make policy determinations when properly delegated such power by the legislature, absent such a delegation, policymaking is an intrusion upon the legislative power.

Respondents contend they had complete discretion to take the challenged action because the General Assembly simply appropriated the $51 million without any indication as to what the funds were appropriated for. In other words, the respondents argue the General Assembly did not direct the Board to fund the premium increases through any particular means, rather the Plan received a general appropriation of $51 million and the Board was required to decide how those funds should be spent. Alternatively, the respondents assert the Board had the power to decline the appropriated funds and unilaterally set the State and enrollee contribution rates. We reject both contentions.

We accept the unremarkable principle asserted by the respondents and acknowledged by other jurisdictions that an appropriation is only a spending cap, not a spending mandate, and therefore, an executive agency is generally not required to spend all appropriated funds. *See, e.g., Detroit City Council v. Mayor of Detroit,* 449 Mich. 670, 537 N.W.2d 177, 181 (1995) ("[A]n appropriation is not a 'mandate' to spend."); *Island Cnty. Comm. on Assessment Ratios v. Dept. of Revenue,* 81 Wash.2d 193, 500 P.2d 756, 763 (1972) ("An appropriation of public monies by the legislature is not a mandate to spend, rather it is an authorization given by the legislature to a designated agency to use not to exceed a stated sum for specified purposes."); *see also* 81A C.J.S. *States* § 399 (2012) ("The appropriation is ... merely an authorization to spend the appropriated sums."). To require otherwise would be to force agencies to waste tax dollars, rather than to encourage the efficient delivery of governmental services.

However, as established by this Court and decisions from other jurisdictions, an executive agency's power to decline to use all appropriated funds does not exist when there is a legislative mandate requiring the expenditure of those funds. We have made clear that "[t]he General Assembly has the duty and authority to appropriate money as necessary for the operation of the agencies of government and has the right to specify the conditions under which appropriated monies shall be spent." *Edwards v. State*, 383 S.C. 82, 90, 678 S.E.2d 412, 416 (2009). Furthermore, where the General Assembly directs that appropriated funds be treated in a particular manner, executive agencies must comply with those directions. *See id.* at 91, 678 S.E.2d at 417 (holding that the "General Assembly has the authority to mandate that the Governor apply for federal funds which it has appropriated" and the Governor must comply with that mandate).

Other jurisdictions, while generally recognizing that an executive agency may decline to spend appropriated funds, also acknowledge that a statute may deprive an agency of that power by directing the expenditure of the funds. For example, in *Ellis v. City of Valdez*, 686 P.2d 700 (Alaska 1984), the Alaska Supreme Court recognized that beyond the usual appropriation of funds by the legislature, in some instances the legislature "both sets aside funds to be used by an administering authority for a particular purpose, and affirmatively directs the authority to accomplish the specified purpose." *Id.* at 705. The court went on to consider an appropriation of funds to purchase property and an agency's decision not to purchase the property. *Id.* at 704–06. The court concluded that because there was no "indication of a legislative mandate directing [the agency] to acquire [the property]," the agency was under no statutory duty to purchase the property. *Id.* at 706.

Similarly, in *Felicetti v. Secretary of Communities & Development*, 386 Mass. 868, 438 N.E.2d 343 (1982), the Massachusetts Supreme Judicial Court considered whether an executive agency acted contrary to an appropriations act by refusing to use appropriated funds. *Id.* at 344. The agency interpreted the act as requiring federal approval of the state's energy assistance plan prior to the agency releasing the funds to eligible individuals. *Id.* at 345. The court disagreed and

construed the act as requiring the funds be distributed prior to federal approval. *Id.* at 346. The court noted that while executive agencies normally may decline to spend appropriated funds, that principle was not applicable because the agency's "action in withholding the funds effectively contravened Legislative policy." *Id.* Thus, the court held the agency's failure to use the appropriated funds as specified violated the appropriations act. *Id.* at 347.

In light of the appropriations act and section 1–11–710, we find the General Assembly mandated the appropriated funds be spent in full on the premium increases and afforded the Board no discretion as to enrollee premiums. The 2012–2013 Appropriations Act expressed the clear intent of the General Assembly that the entire $51 million appropriation be spent on the premium increases and enrollees not bear any of the premium increase. Under a subheading entitled "Rate Increases," the $51 million was listed as being appropriated for "HLTH INSURANCE–EMPLOYER CONTRIBUTIONS." Also, the amount, while slightly more than, closely corresponded to the amount specified in the Board's report to the General Assembly as necessary if the General Assembly decided the State should cover all of the premium increases. In short, in appropriating this amount for that purpose, the General Assembly made clear it had decided the State would bear all of the premium increase.[3] Furthermore, the mem-

---

3. The respondents dispute this conclusion by pointing to prior appropriations acts in which the General Assembly included provisos limiting the ability of the Board to raise enrollee premiums and the lack of such a proviso in the 2012–2013 Appropriations Act. For example, Proviso 63B.5 of the 1998–1999 Appropriations Act provided: "When devising a plan for the method and schedule of payment for the employer and employee share of contributions for Plan Year 1999, the Board shall not increase the contribution rates nor decrease benefits for State Health Plan participants." The respondents assert this language indicates the General Assembly understands that without such limitations, the Board can freely spend less than the full amount appropriated for premium increases. While provisos are useful where an appropriations act is open to interpretation, when an appropriation is clear, a proviso is unnecessary. Here, the appropriation was clear—the Board was to use all of the appropriated funds to cover the premium increases—and thus the lack of a proviso is immaterial.

Likewise the respondents argue the inclusion of a "carry-over" provision in the 2012–2013 Appropriations Act demonstrates the General

bers of the Board all acknowledged that the appropriation indicated that intent.

Additionally, section 1–11–710 mandates the expenditure of the funds appropriated for premium increases, and thus the Board does not have the power to decline to spend all of the appropriated funds. Section 1–11–710(A)(1) provides the Board shall make available to enrollees a group health plan with "maximum benefit to those covered within available resources." Therefore, the statute requires that the Board use all appropriated funds, because to do otherwise—to decline funds and instead place a greater burden on enrollees—would contravene the mandate to provide "maximum benefit ... within available resources." In other words, section 1–11–710 directs the expenditure of the funds and thus deprives the Board of the power to decline to spend the appropriated funds.

Finally, we are guided in our consideration of section 1–11–710 and the 2012–2013 Appropriations Act by the nondelegation doctrine. That doctrine is a component of the separation of powers doctrine and prohibits the delegation of one branch's authority to another branch. *Bauer v. S.C. State Hous. Auth.*, 271 S.C. 219, 232, 246 S.E.2d 869, 876 (1978). While the legislature may not delegate its power to make laws, it may "authorize an administrative agency or board to 'fill up the details' by prescribing rules and regulations for the com-

---

Assembly's recognition that the Board can decline to spend the appropriated funds on premium increases. Contrary to the respondents' assertions, the carry-over provision is compatible with the Board having to use all funds appropriated for premium increases for that purpose because other sources of carry-over funds exist. For example, the Plan's costs for a particular year may be less than anticipated and the surplus funds could be carried-over to the next year.

The respondents also assert the General Assembly's attempt to amend section 1–11–710 through the 2000–2001 Appropriations Act indicates the Board has the power to decline appropriated funds. Section 21 of the 2000–2001 Appropriations Act as passed by the General Assembly would have restricted the Board's ability to raise enrollee contribution rates; however, Governor Hodges vetoed Section 21. Again, while the General Assembly there expressed a desire to codify specific restrictions on the Board's powers in relation to the Plan, that is immaterial in light of the General Assembly's clear intent for the Board to spend all of the 2012–2013 appropriated funds on the premium increases and section 1–11–710's clear mandate that the Board spend all appropriated funds.

plete operation and enforcement of the law within its expressed general purpose." *S.C. State Hwy. Dept. v. Harbin,* 226 S.C. 585, 594, 86 S.E.2d 466, 470 (1955) (citations omitted). Therefore, so long as a statute does not give an agency "unbridled, uncontrolled or arbitrary power," it is not a delegation of legislative power. *Bauer,* 271 S.C. at 233, 246 S.E.2d at 876.

In a somewhat similar case, the Board adopted a plan to reduce appropriations under the 1992 Appropriations Act because of projected revenue shortfalls. *Gilstrap v. S.C. Budget & Control Bd.,* 310 S.C. 210, 423 S.E.2d 101 (1992). The Board's action was challenged as beyond its statutory authority, and we found that construing the statute as allowing the Board to reduce appropriations with the only limitation being that its reductions be as uniform as possible would violate the nondelegation doctrine. *Id.* at 216, 423 S.E.2d at 105. We held that "[i]f the Act is so broad as to allow the Board to apply reductions with the only requirement being that they be applied uniformly, the effect would be to allow the Board to appropriate funds with unbridled discretion." *Id.* Accordingly, we refused to construe the statute as unconstitutional when a constitutional reading was possible, and held the Board did not have the claimed discretion to reduce appropriations. *Id.*

 Here, if the Board could decline appropriated funds based on its own policy choices, it would have the unbridled power to disregard the General Assembly's appropriations and make its own appropriations decisions. *See id.* at 212, 423 S.E.2d at 103 (holding that the appropriation of public funds is a legislative function and that the Board's claimed power to reduce appropriations according to its own criteria would be an impermissible delegation of legislative powers). Furthermore, if the Board can make its own choices as to enrollee premiums based solely on what it believes to be the best policy, the legislature has impermissibly delegated its powers to the Board. Therefore, to interpret section 1–11–710 and the 2012–2013 Appropriations Act as giving the Board the power to decline appropriated funds and instead set contribution rates at the level it desires would constitute an impermissible delegation of legislative powers in violation of the separation of powers. We will not construe statutes to be unconstitutional when susceptible to a constitutional interpreta-

tion. *Joytime Distributors & Amusement Co., Inc. v. State,* 338 S.C. 634, 640, 528 S.E.2d 647, 650 (1999). That constraint on our interpretation of the statutes further supports our conclusion that the Board lacked the power to decline the appropriated funds.

In conclusion, we hold the Board violated the separation of powers by acting beyond its statutory authority and infringing upon the General Assembly's power to make policy determinations, when it declined to use the appropriated funds for the premium increases and instead raised enrollee contribution rates.

## II. NONDELEGATION DOCTRINE

Having found that the Board violated the separation of powers in declining the appropriated funds and setting a different enrollee contribution rate, we need not consider the petitioners' assertion that the Board violated the nondelegation doctrine. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address the remaining issues where a prior issue was dispositive).

## III. INJUNCTION AND REIMBURSEMENT

Petitioners request an injunction prohibiting the increase of their insurance premiums and compelling the Board to utilize the funds appropriated in the 2012–2013 Appropriations Act for premium increases. The respondents contend an injunction is not warranted because they will comply with this Court's ruling. An injunction is a drastic equitable remedy courts may use in their discretion in order to prevent irreparable harm to a party. *Denman v. City of Columbia,* 387 S.C. 131, 140–41, 691 S.E.2d 465, 470 (2010). Due to its drastic and extraordinary nature, courts should issue injunctions with caution and only where no adequate remedy exists at law. *Strategic Res. Co. v. BCS Life Ins. Co.,* 367 S.C. 540, 544, 627 S.E.2d 687, 689 (2006). Petitioners do not face irreparable harm as any premiums paid could be returned. Also, the declaratory judgment entered herein provides petitioners with an adequate remedy at law. Accordingly, an injunction is not necessary.[4]

---

4. Petitioners also sought the reimbursement to enrollees of all premium increases paid as a result of the Board's decision. The increased

410

## CONCLUSION

For the reasons set forth, we enter judgment for the petitioners and declare the Board's premium increase unconstitutional as a violation of the separation of powers. We direct the Board to apply the appropriated funds to the Plan's premium increases.

TOAL, C.J., BEATTY and KITTREDGE, JJ., concur.

PLEICONES, J., concurring in result only.

premiums were to be collected from enrollees starting on January 1, 2013. However, on November 30, 2012, the collection of the increased premiums was stayed by order of the Court. Accordingly, no increased premiums were collected from enrollees, there are no funds to return to enrollees, and the petitioners' request is moot.