757 S.E.2d 408

AMISUB OF SOUTH CAROLINA, INC., AnMed Enterprises, Inc./HealthSouth, LLC, Georgetown Memorial Hospital, Hilton Head Health System, L.P., Medical University Hospital Author-, ity, Piedmont HealthSouth Rehabilitation, LLC, The Regional Medical Center of Orangeburg and Calhoun Counties, Trident NeuroSciences Center, LLC, Waccamaw Community Hospital, Abbeville Nursing Home, Inc., South Carolina Hospital Association, and South Carolina Health Care Association, Petitioners,

v.

SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, Respondent.

Appellate Case No. 2013–001530.

Nos. 27382.

Supreme Court of South Carolina.

Heard March 6, 2014.

Decided April 14, 2014.

Rehearing Denied May 22, 2014.

584

586

C. Mitchell Brown and Travis Dayhuff, both of Nelson Mullins Riley & Scarborough, LLP, of Columbia, William W. Wilkins, Andrew A. Mathias, and Burl F. Williams, all of Nexsen Pruet, LLC, of Greenville, for Petitioners.

W. Marshall Taylor, Jr., Ashley C. Biggers, and James B. Richardson, Jr., all of Columbia, for Respondent.

Swati S. Patel, Chief Legal Counsel for the Office of the Governor, and M. Todd Carroll and Kevin A. Hall, both of Womble Carlyle Sandridge & Rice, LLP, all of Columbia, for Amicus Curiae The Office of the Governor.

## ORIGINAL JURISDICTION

Chief Justice TOAL.

This matter comes before the Court in its original jurisdiction. Ten health care entities, along with the South Carolina Hospital Association and the South Carolina Health Care Association (collectively, Petitioners), seek a declaration from

this Court that the South Carolina Department of Health and Human Services (DHEC) is obligated to enforce the State Certification of Need and Health Facility Licensure Act (the CON Act)[1] and fund the certificate of need (CON) program despite the South Carolina House of Representative's failure to override the Governor's veto of the line item in the state budget providing funding for the program. We grant Petitioners' requested relief.

### FACTS/PROCEDURAL BACKGROUND

The South Carolina General Assembly initially passed the CON Act in 1971. It is a comprehensive approach to containing health care costs for South Carolinians by controlling the construction of health care facilities, the provision of certain services, and the purchase of health care equipment so as to avoid duplication of health care services. Since its adoption in 1971, the CON Act and its corresponding regulations have evolved into a sophisticated regulatory scheme. Under the CON Act, a person or health care facility must obtain a CON from DHEC before constructing a new health care facility, establishing certain health care services, making capital expenditures on certain health care projects, or acquiring certain types of health care equipment. S.C.Code Ann. § 44-7-160 (Supp.2013). In addition, the CON Act and the regulations promulgated pursuant to the CON Act set forth, *inter alia,* specific CON application procedures, project review criteria, and penalties for non-compliance. S.C.Code Ann. §§ 44-7-110 to -394 (2002 & Supp.2013); 24A S.C.Code Ann. Regs. §§ 61-15 (2012). DHEC is responsible for administering the CON program. S.C.Code Ann. § 44-7-140.

In August 2012, DHEC submitted its agency appropriations request to Governor Nikki Haley for Fiscal Year 2013-2014, requesting appropriations for four programs: (I) Administration; (II) Programs and Services; (III) Employee Benefits; and (IV) Non-[R]ecurring Appropriations. DHEC requested funding for the CON Program in subsection (II)(F)(2), Facility & Service Development. DHEC specifically asked for a $773,000 increase from the previous year to be paid from the state's general fund to fund the CON program, resulting in a

---

1. S.C.Code Ann. §§ 44-7-110 to -394 (2002 & Supp.2013).

total of $1,759,915 requested funding for subsection (II)(F)(2). However, in her Executive Budget for Fiscal Year 2013–2014, the Governor recommended no additional funding for the CON program and only allocated a total of $986,615 in combined funds for subsection (II)(F)(2).

In its 2013–2014 appropriations bill, the General Assembly appropriated $1,759,915 to DHEC for subsection (II)(F)(2), as requested by DHEC. By letter dated June 25, 2013, the Governor vetoed certain line items in the General Assembly's appropriations bill. Veto 20, entitled "Closing Programs That Don't Work" (Veto 20), specifically vetoed subsection (II)(F)(2). In her veto message, the Governor stated: "The [CON] Program is an intensely political one through which bureaucratic policy makers deny healthcare providers from offering treatment. We should allow the market to work rather than politics." [2]

The House of Representatives sustained Veto 20.[3] According-ing to Representative Brian White, Chairman of the Ways and Means Committee (Chairman White), he asked the House members to sustain Veto 20 because DHEC had "other funds in that agency they can use and [can] move other people over for that purpose." Thereafter, the General Assembly passed Act No. 101, 2013 S.C. Acts 1, the General Appropriations Act for Fiscal Year 2013–2014 (the 2013–2014 Appropriations Act).

On June 28, 2013, DHEC Director Catherine Templeton issued a letter to health care providers communicating that DHEC would no longer fund the CON program. In pertinent part, the letter stated:

The sustained veto shows the intention of both the Execu-tive and Legislative branches to suspend the operation of the [CON] program for the fiscal year beginning July 1,

2. Although subsection (II)(F)(2) included funding for other services such as the Certificate of Public Advantage program, review of architec-tural plans, inspection of the construction of health care facilities, and fire and life safety requirement inspections at health care facilities, the Governor's veto message only specifically mentioned the CON program.

3. Only if the body in which a bill originated overrides a veto is the veto sent to the other body for its consideration. Therefore, because the House of Representatives did not override Veto 20, it was not sent to the Senate for its consideration.

2013.... [DHEC] has no independent authority to expend state funds for [the CON program] and therefore, the veto completely suspends the program for the upcoming fiscal year. Accordingly, [DHEC] cannot review new or existing applications for [CONs] as of July 1. Moreover, [DHEC] cannot take any [CON] enforcement action. Should the General Assembly restore the program in the future, [DHEC] will not be inclined to take enforcement actions under [the CON Act] for activity that occurs during the program's suspension, unless instructed otherwise by the General Assembly. Suspending the program has the practical effect of allowing new and expanding health care facilities to move forward without the [CON] process.

In response, Chairman White and Representative Murrell Smith, Chairman of the Ways and Means healthcare subcommittee, issued a statement regarding Veto 20, stating in pertinent part that "[t]he House of Representatives did not intend to eliminate the CON Program or its statutory requirements. In fact, the House believes there are a number of ways for the CON Program to retain its function and purpose."

DHEC discontinued the CON program effective July 1, 2013. As of that date, DHEC had thirty-nine undecided CON applications and requests pending.

Petitioners, each past CON recipients, future CON applicants, or pending CON applicants, filed a petition for original jurisdiction, seeking declarations that DHEC's duty to administer the CON program during Fiscal Year 2013–2014 was not suspended and that DHEC has a duty to seek alternative means of funding.

Pursuant to Rule 245, SCACR, we granted Petitioners' petition for original jurisdiction. We further accepted the Governor's amicus curiae brief pursuant to Rule 213, SCACR.

## ISSUES

I. Whether DHEC's duty to administer the CON program was suspended for Fiscal Year 2013–2014 after the House of Representatives sustained the Governor's line item veto eliminating funding for the program?

II. Whether DHEC must fund the administration and enforcement of the CON program?

## LAW/ANALYSIS

■ We preface our opinion by emphasizing the significance of the separation of powers doctrine to the decision we must render in this matter. The South Carolina Constitution provides:

> In the government of this State, the legislative, executive, and judicial powers of the government shall be forever separate and distinct from each other, and no person or persons exercising the functions of one of said departments shall assume or discharge the duties of any other.

S.C. Const. art. 1, § 8. This constitutional mandate "prevents the concentration of power in the hands of too few, and provides a system of checks and balances." *Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013); *State ex rel. McLeod v. McInnis*, 278 S.C. 307, 312, 295 S.E.2d 633, 636 (1982). The General Assembly "has plenary power over all legislative matters unless limited by some constitutional provision." *Hampton*, 403 S.C. at 403, 743 S.E.2d at 262 (citing *Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 438–39, 181 S.E. 481, 486 (1935)). The executive branch, on the other hand, "is constitutionally tasked with ensuring 'that the laws be faithfully executed.' " *Id.* (quoting S.C. Const. art. IV, § 15).

■ History reveals that litigation often arises because of conflicts between the branches of the government. *McLeod*, 278 S.C. at 312–13, 295 S.E.2d at 636. While case law within our state and across the nation involving separation of powers disputes is not a model of consistency, one theme reverberates throughout: the court's role in upholding the separation of powers doctrine is to maintain the three branches of government in positions of equality. When asked to resolve a conflict in which the Governor attempts use her veto pen to rewrite a permanent law, this Court must adhere to well-established separation of powers principles, leaving the power to legislate to the General Assembly, and the power to execute the laws and to veto legislation to the Governor.

### I. Enforcement of the CON Act

The General Assembly must provide annually for all expenditures in a general appropriations act in order to fund the ordinary expenses of state government and to direct the expenditure of these funds. S.C.Code Ann. § 2–7–60 (2005); *Ex parte Georgetown Cnty. Water & Sewer Dist.*, 284 S.C. 466, 469, 327 S.E.2d 654, 656 (1985) (citations omitted). Pursuant to the South Carolina Constitution, "[b]ills appropriating money out of the Treasury shall specify the **objects and purposes** for which the same are made, and appropriate to them respectively their several amounts in distinct items and sections." S.C. Const. art. IV, § 21 (emphasis added); *see also* S.C.Code Ann. § 2–7–60 (requiring that all appropriations "shall be in a definite sum for each purpose or activity with such itemization under the activity as may be deemed necessary by the General Assembly"). In other words, the General Assembly must structure each appropriations act so that each item or section designates an amount of money allocated for a particular function.

Upon an appropriation act's ratification, the act is sent to the Governor for his or her approval. Unlike the general veto power, the Governor has the authority to line item veto a general appropriations act. If the Governor exercises his or her line item veto power, the General Assembly then has the opportunity to either sustain or override the veto. The Governor returns his or her veto, along with a veto message, to the body in which the bill originated. S.C. Const. art. IV, § 21. In the case of a general appropriations act, the House initiates the bill and first receives a veto. If the House overrides the veto by an affirmative two-thirds vote, then the veto is sent to the Senate for its consideration. *See id.* Therefore, the General Assembly may override a line item veto by an affirmative two-thirds vote of each chamber. *Id.* However, if either chamber of the General Assembly does not override the Governor's veto, it is sustained, and the line is stricken. At that point, the bill becomes law notwithstanding the Governor's veto. *Id.; Edwards v. State*, 383 S.C. 82, 91, 678 S.E.2d 412, 417 (2009). The extent and particularities of the Governor's and the General Assembly's respective powers in this setting are crucial to the outcome of this matter, and we will address each in turn.

## A. Governor's Line item Veto Power

■ The Governor may exercise the veto power "only when clearly authorized by the constitution, and the language conferring it is to be strictly construed." *Jackson v. Sanford*, 398 S.C. 580, 584, 731 S.E.2d 722, 724 (2011); *Drummond v. Beasley*, 331 S.C. 559, 564, 503 S.E.2d 455, 457 (1998). Article IV, section 21 of the Constitution provides for the Governor's line item veto power as follows:

> If the Governor shall not approve any one or more of the **items or sections** contained in any bill appropriating money, but shall approve of the residue thereof, it shall become a law as to the residue in like manner as if he had signed it. The Governor shall then return the bill with his objections to the items or sections of the same not approved by him to the house in which the bill originated, which house shall enter the objections at large upon its Journal and proceed to reconsider so much of the bill as is not approved by the Governor. The same proceedings shall be had in both houses in reconsidering the same as is provided in case of an entire bill returned by the Governor with his objections; and if any item or section of the bill not approved by the Governor shall be passed by two-thirds of each house of the General Assembly, it shall become a part of the law notwithstanding the objections of the Governor.

S.C. Const. art. IV, § 21 (emphasis added). The Governor's line item veto is a "negative power to void a distinct item." *Drummond*, 331 S.C. at 565, 503 S.E.2d at 457.

Under article IV, section 21, "the Governor can only veto those parts [in an appropriations bill] labeled by the legislature as items or sections." *Drummond*, 331 S.C. at 563, 503 S.E.2d at 456. Over the years, this Court has developed case law interpreting the reach of the Governor's power to veto "items or sections" within an appropriations bill. *See, e.g., Jackson*, 398 S.C. at 589, 731 S.E.2d at 726–27; *Drummond*, 331 S.C. at 563, 503 S.E.2d at 457; *S.C. Coin Operators Ass'n v. Beasley*, 320 S.C. 183, 187–188, 464 S.E.2d 103, 105 (1995); *Cox v. Bates*, 237 S.C. 198, 220, 116 S.E.2d 828, 837 (1960); *State ex rel. Long v. Jones*, 99 S.C. 89, 92, 82 S.E. 882, 883 (1914). These decisions, interpreting the Governor's line item veto authority, certainly impact the effect of the House of

Representatives' failure to override Veto 20. In striving to maintain the proper constitutional balance between the branches of our state's government, we take this opportunity to clarify and modify the language in one of these cases.

In *Jackson v. Sanford*, this Court found the Governor's line item veto of *part* of an item within an appropriations bill resulted in improper modification of legislation and thus was an unconstitutional exercise of the veto power. 398 S.C. at 588–89, 731 S.E.2d at 726–27. In that case, Governor Sanford purported to veto the portion of funds allocated to the State Budget and Control Board to be drawn from the General Fund, yet did not veto the purpose for which those funds were allocated. *Id.* at 583, 587, 731 S.E.2d at 723, 725. According to the Court, the "net result" of the Governor's line item veto was that "the total appropriation for each of the Board's programs, positions, and expenses was reduced by the amount the General Assembly had designed to be drawn from the General Fund, but the programs, positions, and expenses themselves were not eliminated." *Id.* at 587, 731 S.E.2d at 725.

The Court began its analysis in *Jackson* by defining " 'item' for constitutional purposes," as "embrac[ing] a specified sum of money together with the 'object and purpose' for which the appropriation is made." *Id.* at 585, 731 S.E.2d at 725 (footnote omitted) (citing S.C. const. art. IV, § 21). The Court then stated that if "a line in the appropriations bill is vetoed in a constitutional manner and the veto is sustained, then the line is stricken and there is no longer any authority to expend state funds for the purpose stated on the line." *Id.* at 588, 731 S.E.2d at 726 (citation omitted). Finally, the Court concluded that the Governor's veto in that case was unconstitutional because "the Governor is empowered to veto 'items,' which comprise both the designated funds and the objects and purposes for which the appropriation is intended," but may not veto only part of an item. *Id.* at 589, 731 S.E.2d at 726.

■ Today, we clarify the language in *Jackson* defining "item" and discussing a line item's objects and purposes. What is meant is that the line item veto eliminates any authority to expend the vetoed funds for the objects and purposes specified on the line. To the extent *Jackson* is read

to imply that a line item's objects and purposes refer to the underlying legislation, we now recognize that these assertions in *Jackson* are imprecise. It is argued by DHEC that this language implies and should be construed to mean that a line item veto extends beyond a line in an appropriations act to affect an underlying permanent law. This implication is not intended.

The "objects and purposes" of a line item within an appropriations act merely refer to the label—designating the funding for a particular purpose—that the General Assembly must attach to any line item in an appropriations act. *See* S.C. const. art. IV, § 21; *Ex parte Georgetown,* 284 S.C. at 469, 327 S.E.2d at 656; *cf. Fla. H.R. v. Martinez,* 555 So.2d 839, 843 (Fla.1990) (defining a specific appropriation as an "identifiable, integrated fund which the legislature has allocated for a specified purpose" (citation omitted)).

 We hold that a Governor's line item veto destroys only the funding provided for in that line item.[4] Accordingly, the Governor has no authority to utilize the line item veto power to negate the effect of a long-standing permanent law. The authority to enact, modify, or repeal legislation lies solely within the General Assembly's broader authority. *See McLeod,* 278 S.C. at 312, 295 S.E.2d at 636. As the Supreme Court of Florida has explained, the line item veto power "is intended to be a negative power, the power to nullify, or at least suspend, legislative intent. *It is not designed to alter or amend legislative intent." Martinez,* 555 So.2d at 843 (emphasis in original) (quoting *Brown v. Firestone,* 382 So.2d 654, 662 (Fla.1980)).

 While the line item in the 2013–2014 Appropriations Act provides funding for the CON program, the underlying CON Act mandates the existence of the CON program. Therefore, we hold that Veto 20 reached only as far as to

---

4. Furthermore, to the extent that any language in this Court's prior decisions suggests that a Governor's veto may nullify more than just the funding provided for in a line item, we find that language is overly broad. *See, e.g., Drummond v. Beasley,* 331 S.C. 559, 564, 503 S.E.2d 455, 457 (1998); *State ex rel. Long v. Jones,* 99 S.C. 89, 82 S.E. 882 (1914) (stating that when a line item veto was sustained, "everything embraced in that item failed to become law").

nullify the object and purpose of section (II)(F)(2) of the 2013–2014 Appropriations Act-the *funding* for the CON program and any other programs included in that line item.

 The Governor's veto message leaves no doubt that she intended to use her line item veto power to abolish the entire CON program. However, the Governor is not empowered to exercise her veto pen in a manner that so broadly affects public policy and attempts to alter legislative intent by reaching back to repeal a permanent law. *See Hampton,* 403 S.C. at 403, 743 S.E.2d at 262 ("Included within the legislative power is the sole prerogative to make policy decisions; to exercise discretion as to what the law will be." (citation omitted)). Absent a proper delegation of power to a non-legislative body to make policy determinations, "policymaking is an intrusion upon the legislative power." *Id.* Similarly, we agree with the Supreme Judicial Court of Massachusetts that a "principle of great importance in our tripartite form of government is 'that it is for the Legislature, and not the executive branch, to determine finally which social objectives or programs are worthy of pursuit.' " *Op. of the Justices,* 375 Mass. 827, 376 N.E.2d 1217, 1221 (1978) (citation omitted).

To permit the Governor to exercise her line item veto power to abolish the CON program—a program mandated by permanent law—would certainly alter and amend legislative intent. Moreover, expanding the line item veto power to allow it to reach a permanent law enacted years earlier by vetoing a line item in an appropriations act would violate the separation of powers doctrine.

 Notwithstanding the Governor's inability to abolish a program established by permanent legislation through a line item veto, we acknowledge that the General Assembly may suspend or repeal permanent legislation and effectively abolish a program established by such law. Therefore, because the House of Representatives sustained Veto 20, we must analyze now whether the General Assembly intended to suspend DHEC's duty to administer the CON program for Fiscal Year 2013–2014.

## B. General Assembly's Intent to Suspend

■■ As discussed *supra*, it is the General Assembly's prerogative to modify or repeal legislation and to make policy decisions. *See Hampton*, 403 S.C. at 403, 743 S.E.2d at 262. Here, we find that the General Assembly did not intend to suspend DHEC's obligations under the CON Act for Fiscal Year 2013–2014.

■■ There is no question that the General Assembly has the power, where there is no constitutional prohibition, to temporarily suspend a statute's operation. *McLeod*, 256 S.C. at 26, 180 S.E.2d at 640. An appropriations act, though generally temporary in duration, "has equal force and effect as a permanent statute" and may suspend the operation of a permanent statute during the time the appropriation act is in force. *Plowden v. Beattie*, 185 S.C. 229, 236, 193 S.E. 651, 654 (1937) (citations omitted). "When such intention is clearly manifest[,] this [C]ourt has no choice but to give force and effect thereto." *McLeod*, 256 S.C. at 26, 180 S.E.2d at 640.

■■ The primary rule of statutory construction is to ascertain and give effect to the intent of the General Assembly. *Town of Mt. Pleasant v. Roberts*, 393 S.C. 332, 342, 713 S.E.2d 278, 283 (2011). It is well-established that this Court will not construe a statute by concentrating on an isolated phrase. *Laurens Cnty. Sch. Dists. 55 & 56 v. Cox*, 308 S.C. 171, 174, 417 S.E.2d 560, 561 (1992) ("The true guide to statutory construction is not the phraseology of an isolated section or provision, but the language of the statute as a whole considered in the light of its manifest purpose. In applying the rule of strict construction the courts may not give to particular words a significance clearly repugnant to the meaning of the statute as a whole, or destructive of its obvious intent."); *see also Sloan v. S.C. Bd. of Physical Therapy Exam'rs*, 370 S.C. 452, 468, 636 S.E.2d 598, 606–07 (2006) ("A statute as a whole must receive practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of lawmakers."). "All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute." *State v. Sweat*, 386 S.C. 339, 350, 688

S.E.2d 569, 575 (2010). Moreover, statutes dealing with the same subject matter are *in pari materia* and must be construed together, if possible, to produce a single, harmonious result. *Joiner ex rel. Rivas v. Rivas*, 342 S.C. 102, 109, 536 S.E.2d 372, 375 (2000). Because we must presume that the General Assembly is familiar with existing legislation, statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative. *Hodges v. Rainey*, 341 S.C. 79, 88, 533 S.E.2d 578, 583 (2000) (citations omitted).

 In determining whether a permanent statute is suspended, we must look to the budget proviso juxtaposed with the permanent statute. *Beaufort Cnty. v. S.C. State Election Comm'n*, 395 S.C. 366, 371, 374, 718 S.E.2d 432, 435, 436 (2011). In this regard, there must be an "irreconcilable conflict" between the appropriations act and the permanent statute before we will find the latter temporarily suspended. *Plowden*, 185 S.C. at 236, 193 S.E. at 654 (citations omitted). Thus, only provisions of a permanent statute that conflict with the current budget provisos are suspended. *Beaufort Cnty.*, 395 S.C. at 374, 718 S.E.2d at 436 (citing *McLeod*, 256 S.C. at 26, 180 S.E.2d at 640).

For example, in *McLeod*, the Court reconciled a controversy arising out of two legislative enactments dealing with state officers' salaries. 256 S.C. at 23, 180 S.E.2d at 639. A permanent statute and an appropriations act each provided differing salary amounts for state officers, such as the Governor and Lieutenant Governor.[5] *Id.* at 24, 180 S.E.2d at 639–40. Citing precedents requiring an "irreconcilable conflict" and manifest legislative intent to suspend a permanent statute, the Court found that the permanent statute designating salaries was suspended during Fiscal Year 1970–1971 because there was an express conflict. *Id.* at 27, 180 S.E.2d at 641.

Likewise, in *Beaufort County*, the Court considered whether an appropriations act allowing the State Election Commission to use funds toward a presidential primary suspended the temporal limitation of a permanent statute which authorized the State Election Commission and the county election com-

---

5. For example, the 1969 act fixed the Governor's salary at $35,000 and the 1970 appropriations act provided for a $25,000 salary. *McLeod*, 256 S.C. at 24, 180 S.E.2d at 639.

missions to conduct presidential primaries for the particular election cycle. 395 S.C. at 369–71, 718 S.E.2d at 434–35. The Governor vetoed the budget provisos, but the General Assembly overrode the vetoes. *Id.* at 374–75, 718 S.E.2d at 437. In holding that the appropriations act suspended the temporal limitation of the permanent statute and authorized the commissions to conduct a presidential primary, the Court discerned legislative intent from both "the statutory scheme *and* budget provisos," finding the General Assembly intended to temporarily suspend the conflicting temporal limitation of the permanent statute in favor of the budget proviso. *Id.* at 374, 718 S.E.2d at 436.

In contrast to *McLeod* and *Beaufort County*, we find no irreconcilable conflict between the CON Act and the absence of funding in the 2013–2014 Appropriations Act. The failure to fund the CON program does not negate the directive issued by the General Assembly (and detailed in the CON Act) mandating DHEC administer the CON program.

Even more importantly, we find that in sustaining Veto 20, the General Assembly did not intend to suspend DHEC's duty to administer the CON program. We must evaluate the effect of Veto 20 in light of the entirety of the CON Act. The CON program is mandated by the CON Act, a free-standing, permanent piece of legislation that has evolved into an expansive regulatory scheme, not by a line item appropriation. DHEC does not argue that the General Assembly has repealed the entire CON Act, but only that Veto 20 suspends DHEC's duty to administer the CON program. We cannot conceive that by sustaining Veto 20, the General Assembly intended to abolish a program mandated by permanent law which itself has not been repealed.[6]

Further, in construing the General Assembly's intent, we find great significance in the fact that only the House of

---

6. As evidence of legislative intent to suspend the CON program, DHEC points to the final proviso in the 2013–2014 Appropriations which states that "[a]ll acts or parts of acts inconsistent with any of the provisions of Part IA or IB of this act are suspended for Fiscal Year 2013–2014." We do not find that this provision suspends the CON program. Not only was this standard provision included pre-veto as a part of the General Assembly's 2013–2014 appropriations bill initially *granting* the funding DHEC requested, we cannot construe this provision in isolation.

Representatives had the opportunity to override Veto 20. Because the House failed to overrule Veto 20, the veto was not sent to the Senate for its consideration. The Senate never had the opportunity to demonstrate its intent. Thus, a finding that the House of Representatives' decision to sustain Veto 20 reflected the General Assembly's intent as a whole to suspend the CON program would ignore an entire chamber's intent. We cannot sanction such a result.

 Finally, DHEC urges this Court to consider the Governor's veto message in determining legislative intent. DHEC argues that by sustaining Veto 20, the House of Representatives agreed with the Governor's intention to abolish the CON program. We disagree. The Governor's veto message is not a part of the 2013–2014 Appropriations Act and "does not have the force of law [because] it is [neither] a legislative act nor an Executive Order." *Drummond*, 331 S.C. at 564, 503 S.E.2d at 458. To hold otherwise would violate the separation of powers doctrine by altering the allocation of powers granted to the three branches of government by our state's constitution. Therefore, the Governor's veto message abolishing the CON program has no force of law. The power to abolish the CON program lies exclusively within the realm of the General Assembly and here, we cannot discern the requisite intent.

Although Veto 20 effectively struck the funding for subsection (II)(F)(2) in the 2013–2014 Appropriations Act, we find that in sustaining Veto 20, the General Assembly did not intent to suspend the CON program. Therefore, we hold that DHEC has a duty to administer the CON program, as contemplated by the CON Act, for Fiscal Year 2013–2014.

## II. Funding the CON Program

 Petitioners argue that DHEC is required to fund the CON program, regardless of the 2013–2014 Appropriations Act's failure to appropriate funding for the program. We agree.

 Our state's constitution unquestionably permits a Governor's line item veto—if constitutional and not overridden by the General Assembly—to eliminate a line item providing funding for a particular purpose. *See* S.C. Const. art. IV,

§ 21. Nevertheless, under separation of powers principles, "[e]xecutive agencies are required to comply with the General Assembly's enactment of a law until it has been otherwise declared invalid." *Edwards,* 383 S.C. at 91, 678 S.E.2d at 417 (citing *Layman v. State,* 376 S.C. 434, 450, 658 S.E.2d 320, 328 (2008)). In a case such as this, we recognize one caveat: "[a]s creatures of statute, regulatory bodies such as DHEC possess only those powers which are specifically delineated." *City of Rock Hill v. S.C. Dep't of Health & Envtl. Control,* 302 S.C. 161, 165, 394 S.E.2d 327, 330 (1990).

We have held that the permanent law mandating the CON program was not affected by House of Representatives' decision to sustain Veto 20. Under the CON Act, DHEC's responsibility to administer the CON Act is not discretionary, and thus, DHEC must comply with the CON Acta duty that inevitably encompasses funding the CON program.

DHEC contends that the General Assembly's failure to provide funding for the CON program in the 2013–2014 Appropriations Act forecloses the possibility of administering the CON program. We view this argument as a smoke screen. Contrary to DHEC's argument, we conceive at least two alternate means of funding the CON program specifically delineated to DHEC.

First, DHEC may utilize its emergency regulatory authority to adopt a fee structure to support the administration of the CON program. Section 44–7–150(5) of the South Carolina Code provides that DHEC "may charge and collect fees to cover the cost of operating the [CON] program, including application fees, filing fees, issuance fees, and nonapplicability/exemption determination fees." S.C.Code Ann. § 44–7–150(5) (2010). DHEC "shall develop regulations which set fees as authorized by this article." *Id.* The statute requires DHEC to determine the level of the fees "after careful consideration of the direct and indirect costs incurred by [DHEC] in performing its various functions and services in the [CON] program." *Id.*

DHEC points to the statute's provision requiring that the first $750,000 collected in accordance with this section must be deposited into the general fund of the state. *Id.* However, any fee collected in excess of $750,000 "must be retained by

[DHEC] and designated for the administrative costs of the [CON] program." *Id.* According to DHEC, it collected less than $750,000 in fees in each fiscal year since 2010, meaning that all money collected during those years was deposited into the state's general fund. Therefore, DHEC argues that it is unlikely that DHEC could collect enough fees in Fiscal Year 2013–2014 to retain enough funding to operate the CON program. We find this argument unpersuasive. Section 44–7–150(5) clearly authorizes DHEC to charge and collect fees at any level of its choosing. Neither the 2013–2014 Appropriations Act nor any other law limits that authority.

Second, the 2013–2014 Appropriations Act contains a general proviso stating, in pertinent part:

> 117.9. (GP: Transfers of Appropriations) Agencies and Institutions **shall be authorized to transfer appropriations** within programs and **within the agency** with notification to the Division of Budget and Analyses and Comptroller General. No such transfer may exceed twenty percent of the program budget. Upon request, details of such transfers may be provided to members of the General Assembly on an agency by agency basis.

(Emphasis added.) Veto 20 and the General Assembly's failure to fund the CON Program in the 2013–2014 Appropriations Act do not prevent DHEC from exercising this authority to transfer appropriations within the agency.[7]

DHEC has indicated an unwillingness to resort to this funding option. However, we find that proviso 117.9 provides DHEC with a feasible mechanism by which it could fund the CON program and thus carry out its statutorily mandated obligation. Therefore, we find that the General Assembly, through section 44–7–150(5) and proviso 117.9, has provided DHEC with possibilities for funding the CON program other than the receipt of funds from the 2013–2014 Appropriations Act. While we hold that DHEC must fund the CON program, we decline to specify the manner in which DHEC must do so.

---

7. Indeed, Chairman White encouraged DHEC to do just that in his floor comments on the veto.

CONCLUSION

For the foregoing reasons, we hold that the House of Representatives' decision to sustain Veto 20 did not suspend DHEC's duty to administer the CON program. Therefore, we declare that DHEC has a duty to administer and fund the CON program for Fiscal Year 2013–2014 as contemplated by the CON Act.

**JUDGMENT FOR PETITIONERS.**

BEATTY, KITTREDGE and HEARN, JJ., concur.

PLECIONES, J., concurring in part and dissenting in part in a separate opinion.

Justice PLEICONES.

I respectfully dissent. In my opinion, when the House sustained the Governor's veto, the effect was to prevent the expenditure of funds by DHEC for the CON program for fiscal year 2013–2014. *Jackson v. Sanford,* 398 S.C. 580, 731 S.E.2d 722 (2011). In my view, the CON program and its requirements remain the law, but all applications in process are suspended, no new applications can be accepted, and all other matters are in limbo unless and until the program is again funded.

The Governor's Veto 20 provides:

> Veto 20 Part IA, Page 100; Section 34, Department of Health and Environmental Control; II. Programs and Services, F. Health Care Standards, 2. Facility/Service Development—Total Facility & Service Development: $1,759,915 Total Funds; $1,422,571 General Funds

The Certificate of Need program is an intensely political one through which bureaucratic policymakers deny new healthcare providers from offering treatment. We should allow the market to work rather than politics.[8]

In my view, this is an effective line item veto of appropriations found in Part IA, § 34, II F. 2, to wit:

---

8. To the extent the Governor's veto message indicated her intent to "abolish" the CON program, it is irrelevant. *E.g. Drummond v. Beasley,* 331 S.C. 559, 503 S.E.2d 455 (1998).

## F. HEALTH CARE STANDARDS
## 2. FACIL/SVC DEVELOPMENT

| PERSONAL SERVICE | | |
|---|---|---|
| CLASSIFIED POSITIONS | 1,376,569 | 1,187,333 |
| | (9.74) | (6.83) |
| UNCLASSIFIED POSITIONS | 117,743 | 117,743 |
| | (1.00) | (1.00) |
| OTHER PERSONAL SERVICES | 15,643 | 8,818 |
| TOTAL PERSONAL SERVICE | 1,509,955 | 1,313,894 |
| | (10.74) | (7.83) |
| OTHER OPERATING EXPENSES | 249,960 | 128,677 |
| *TOTAL FACILITY & SERV DEVEL | 1,759,915 | 1,442,571 |
| | (10.74) | (7.83) |

I agree with the majority that the effect of Veto 20 was to eliminate funding for the CON program for fiscal year 2013–2014. *State ex rel. Long v. Jones*, 99 S.C. 89, 82 S.E. 882 (1914). The House did not override this veto, and I know of no basis for a court to inquire into the "intent" behind the House vote using maxims of statutory construction.[9] Nor do I

9. The majority errs when it relies upon statements concerning "intent" made by members, whether found in the House Journal or other sources. Pursuant to the enrolled bill rule:

[T]he true rule is, that when an act has been duly signed by the presiding officers of the General Assembly, in open session in the Senate–House, approved by the Governor of the state, and duly deposited in the office of the secretary of state, it is sufficient evidence, nothing to the contrary appearing upon its face, that it passed the General Assembly, and that it is not competent either by the journals of the two houses, or either of them, or by any other evidence, to impeach such an act. And this being so, it follows that the court is not at liberty to inquire into what the journals of the two houses may show as to the successive steps which may have been taken in the passage of the original bill.

The court gives the following reasons for the adoption of the enrolled bill rule: 'Public policy, certainty as to what the law is, convenience, and that respect due by the courts to the wisdom and integrity of the Legislature, a co-ordinate branch of the government, all require that the enrolled bill, when fair upon its face, should be accepted without question by the courts.'

. . .

Having been properly authenticated as required by the Constitution, it becomes the "sole expository of its own contents and the conclusive evidence of its existence and valid enactment," and this court cannot look to the Journals of either House or to other extraneous evidence

understand the majority's concern that the Senate did not have the opportunity to vote on the Governor's veto since the House did not override it. This procedure is mandated by our Constitution, which operates in the same manner whenever there is a gubernatorial veto, that is, the vetoed bill is returned first to the chamber where it originated. Only if that body votes to override the veto by a two-thirds majority does the other chamber have the opportunity to consider the veto. S.C. Const. art. IV, § 21. I simply do not understand why the majority finds "great significance" in the fact the Constitution's procedure was honored here.

We have recently held that if an appropriations veto is lawful (and there is no challenge to the veto here) and the veto is not overridden (and there is no challenge to the House vote), then "there is no longer any authority to expend state funds for the purpose stated on the line." *Jackson v. Sanford,* *supra; see also State ex rel. Long, supra.* I believe that the majority and I agree on the meaning of this rule: there can be no funding for the CON program during fiscal year 2013–2014 unless and until the General Assembly appropriates funds for this purpose. *See* Singer & Singer 1 *Southerland Statutory Constr.* § 16:9 (2010) (if gubernatorial appropriation veto not overridden, legislature may reenact a separate appropriations act).

I know of no authority that would permit this Court to order DHEC to fund the CON program in the face of the House's failure to override the Governor's line item veto. Such interference with the prerogatives given to the executive and the legislature under our Constitution is a clear violation of the separation of powers doctrine. *Compare Hampton v. Haley,* 403 S.C. 395, 743 S.E.2d 258 (2013) (allowing executive agency to decline to spend legislatively appropriated funds based on its own policy choices would violate the doctrine). Further, to read the proviso in Part IB, § 117.9, which permits agencies to redistribute appropriated funds, as does the majority, negates the Governor's line item veto authority

---

in order to ascertain its history or its provisions, or to inquire into the manner of its enactment.
*State ex rel. Coleman v. Lewis,* 181 S.C. 10, 19–20, 186 S.E. 625, 629 (1936) (internal citations omitted).
There is no legal basis for an inquiry into "intent" here.

and undermines our constitutional system. Under the majority's reading, an agency is free to ignore the will of the Governor as expressed through her veto, and that of the General Assembly in sustaining that veto, and may spend money as it sees fit. The majority cites no authority to support its construction of this proviso,[10] and I will be surprised if there were any as such a reading would effectively negate the Governor's veto authority. Finally, if it were true that DHEC could revive the dormant CON program simply by raising fees through its emergency regulatory authority, then any rogue agency could operate in defiance of the Constitution which gives the Governor and the General Assembly the authority to suspend the operation of a program by line item veto and subsequent vote.

I agree with the majority that the CON program continues to exist despite the Governor's veto' and the House's failure to override that veto, and that its statutory and regulatory requirements must be met before one may proceed with a regulated activity. However, until funding for this program is reinstated by the General Assembly, no new matters can be initiated and all pending matters are in limbo.

For the reasons given above, I respectfully dissent from the majority's finding that the Court can order DHEC to fund the CON program.

---

**10.** Since this proviso does not "specify objects and purposes" nor "appropriate several amounts in distinct items and sections," it is not subject to the Governor's veto authority. S.C. Const. art. IV, § 21; *Florida Senate v. Harris*, 750 So.2d 626 (Fla.1999). Under the majority's view, the inclusion of this "unvetoable" proviso in an appropriations bill which is included only to satisfy the terms of S.C.Code Ann. § 11–9–10 gives entities receiving funds under that bill free reign to spend those monies as they see fit.