713 S.E.2d 650

**SOUTHEASTERN SITE PREP, LLC, Southeastern Property Development, LLC, Steve Desimone, and Thomas Viljac, Respondents,**

v.

**ATLANTIC COAST BUILDERS AND CONTRACTORS, LLC and James N. Richardson, Jr., Appellants.**

No. 4845.

Court of Appeals of South Carolina.

Submitted March 1, 2011.

Decided June 22, 2011.

98

W.H. Bundy, Jr. and M. Brent McDonald, of Mt. Pleasant, for Appellants.

Robert Vaux, Antonia Lucia, and Mark S. Berglind, of Bluffton, for Respondents.

SHORT, J.

Atlantic Coast Builders and Contractors, LLC (Atlantic) and James N. Richardson, Jr. (collectively, Appellants) appeal the special referee's denial of their motion for sanctions. We affirm.[1]

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

## FACTS

Southeastern Site Prep, LLC (Southeastern), Southeastern Property Development, LLC (SPD), Steve Desimone, and Thomas Viljac (collectively, Respondents) filed this action alleging nine causes of action against Atlantic: (1) breach of contract accompanied by fraudulent act; (2) breach of contract; (3) quantum meruit/unjust enrichment; (4) conversion; (5) fraud and deceit/intentional misrepresentation; (6) breach of fiduciary duty; (7) Unfair Trade Practices Act violation; (8) misappropriation of a trade secret; and (9) tortious interference with contracts.

Respondents alleged that during 2001 and 2002, the parties entered into negotiations for a merger and for Richardson[2] to lease or purchase real property owned by SPD, which was owned by Desimone. Southeastern and Atlantic were both suffering from an economic downturn in the construction industry and were in poor financial condition. Southeastern owned dirt pits, which according to Desimone, are "very critical in a site business, which Atlantic didn't have." Southeastern also owned its own extensive facility and was "fully manned and ready to go for a heavy construction company," whereas Atlantic rented a facility on a month-to-month basis, and its lease was ending. Southeastern had engineering staff, computer technology, and survey skills, but lacked financial savvy. Also, Southeastern had bond capability of $2 million to $3 million and had been bonded for $1.8 million in the past, whereas Atlantic had bond capability of only $750,000. Desimone testified: "We kind of did the same things, although they were much smaller and they wanted to move into the market. They had something that we needed; we had something that they needed and it just only made sense."

For five to six months beginning mid–2001, the companies' principals discussed the merger. During the negotiations, Southeastern disclosed "confidential and proprietary business information, including but not limited to, customer lists, notes payable, pending and future contracts, and financial statements." Southeastern also provided information on its equipment, existing contracts, and possible future contracts.

---

2. Richardson owned the Richardson Group, which owned Atlantic.

George J. Akmon, the chief operating officer of the Richardson Group, was responsible for budgets, business plans, personnel, and cash planning for Atlantic. There were between thirty and fifty meetings between Southeastern and Atlantic, and the parties produced numerous memoranda memorializing the agreement. Most of the meetings were between Desimone and Akmon, with Richardson being involved in about ten of the meetings. In January or early February 2002, Akmon, with the knowledge and consent of Richardson, prepared a document embodying the terms of the agreement and an extensive business plan incorporating the merger. According to Southeastern, the parties reached an agreement by January 30, 2002.

Pursuant to the alleged agreement, Richardson, individually, was to lease the property for $15,290.43 per month with an option to purchase for $1.6 million. Southeastern was to contribute approximately $600,000 in equipment equity to Atlantic. Atlantic was to assume the notes payable on the equipment, hire Thomas Viljac of Southeastern as the chief of engineering, and hire Desimone as CEO for $6,000 per month, and eventually, a twenty percent equity interest in the merged company. Respondents maintain the closing documents were scheduled to be completed on February 14, 2002. No documents were ever signed.

On February 6, 2002, Richardson called a meeting of the employees of both companies, announced the merger, and directed the employees of Southeastern to fill out payroll paperwork for Atlantic. Atlantic began paying the employees and met with a bonding company to get a performance bond. Atlantic sent a facsimile to BB & T Bank and requested a draw using two pieces of Southeastern's equipment as collateral. In the days following the February 6 meeting, Atlantic cut locks on the fences located at the property, replaced the Southeastern signs on the property and equipment with Atlantic signs, and moved in. The companies performed business as one during the following two weeks.

On February 13, 2002, Desimone went to the office and Atlantic's employee, Paul Fullmore, attacked him, hitting him twice in the head with a radio and grabbing a gun from a truck. Thereafter, Akmon informed Desimone the "deal was

on hold." Richardson, per Akmon, then set a "new deal" requiring Desimone to forego his job and his twenty percent equity interest. Desimone initially refused, but Akmon presented a second revision, and Desimone agreed because he had "held off" creditors based on the merger.

On February 18 and 19, 2002, Atlantic moved out. Shortly thereafter, Southeastern's past-due obligations, allegedly renegotiated based on the merger, became due. Creditors seized Southeastern's computers, and equipment with equity valued at between $400,000 and $856,000. These assets were allegedly resold at low auction prices. Atlantic's actions allegedly prevented Southeastern from servicing existing customers, attracting new customers, and continuing as a viable concern. Respondents alleged other damages including: (1) loss of future jobs; (2) missing equipment; (3) increased interest and attorney's fees on debts; (4) damaged reputation in the community; (5) loss of employees; (6) foregone opportunities to pay off its debt by open market sales, debt consolidation, or other partnerships; (7) personal judgments against Desimone and Viljac; (8) loss of profits on current and future contracts Southeastern had been negotiating, some of which Atlantic performed; and (9) loss of goodwill. Southeastern ceased doing business by August 2002, and Viljac and Desimone faced hundreds of thousands of dollars in judgments. Respondents filed this action in October 2003.

The parties engaged in lengthy and extensive discovery. Appellants filed a motion for summary judgment on May 31, 2005. At the March 7, 2006 hearing on the motion before the Honorable Jackson V. Gregory, Respondents withdrew several causes of action. Respondents' counsel stated: "Your Honor, there are a number of causes of action which I would be willing to withdraw at this point.... [W]e have now gone through a number of depositions and I am willing to ... withdraw ... a number of the causes of action." Respondents withdrew the actions for quantum meruit/unjust enrichment, conversion, breach of fiduciary duty, Unfair Trade Practices Act violation, and misappropriation of a trade secret. Judge Gregory granted summary judgment to Appellants on the cause of action for tortious interference with contracts and on all causes of action as to the plaintiff Viljac. Respondents moved to amend their complaint. Judge Gregory ruled they

could file a subsequent motion with an attached amended complaint.

Respondents also conceded the original individual defendants, James N. Richardson, Jr. and George J. Akmon, were entitled to summary judgment on the breach of contract cause of action. Judge Gregory denied summary judgment as to the remaining causes of action by order dated September 26, 2006. In denying summary judgment, Judge Gregory found "a pretty good question of fact [as to] partial performance ... to take it out of the statute of frauds...." The order also denied Respondents' motion to amend their complaint. However, the order granted leave to proceed in the future on a motion to amend to include the issue of piercing the corporate veil, "at a later time when it would be more appropriate...."

On March 19, 2007, Judge Mullen presided over the hearing on Respondents' motion to amend the complaint, demand a jury trial, and compel Richardson to respond to discovery requests for financial disclosures. Atlantic agreed to the amendment, but objected to the request for a jury trial. Judge Mullen denied the request for a jury trial and granted the motion to amend the complaint.

The Honorable Thomas Kemmerlin, Jr. presided over the bench trial. At the start of the trial, Judge Kemmerlin refused to grant Appellants' renewed motion for summary judgment. After Respondents presented their case, Appellants moved for summary disposition. Judge Kemmerlin took the voluminous record of depositions under advisement. By order dated April 8, 2009, Judge Kemmerlin dismissed the three remaining causes of action, finding the breach of contract causes of action were barred by the statute of frauds, and Respondents failed to prove fraud.

Appellants moved for sanctions under Rule 11, SCRCP, or the South Carolina Frivolous Civil Proceedings Sanctions Act (the Act). In his order denying the motion, Judge Kemmerlin found:

Obviously the mere loss of a case does not subject a party ... to a suit by the winner for Sanctions; if it did, the Court System could not function. And no lawyer should be held to a standard of brilliance in the prediction of the outcome of a lawsuit. Fortunately, the law does not require an attorney to

be brilliant; it merely requires him to be competent. Did the Plaintiffs' Attorneys fail to meet this standard? I say "No."

The case was complicated . . . [and the parties] at the early stages of the litigations referred to the result they sought as a "merger." What was sought was not a merger but some form of sale of real and personal properties—which brought into play the statute of frauds and under that statute [Plaintiffs were] required to have a writing sufficient to satisfy the statute, and what would be sufficient part performance if there was no writing. I find that while the Plaintiffs' Attorneys could not get "around" the statute of frauds, I do not regard them as incompetent because they were not successful.

Judge Kemmerlin denied the motion for sanctions, concluding: "Both sides fought the good fight." This appeal followed.

## STANDARD OF REVIEW

The determination of whether attorney's fees should be awarded under Rule 11 or under the Act is treated as one in equity. *In re Beard,* 359 S.C. 351, 357, 597 S.E.2d 835, 838 (Ct.App.2004) (applying an equitable standard of review of factual findings in action for sanctions under Rule 11 and the Act). In an action in equity tried by the judge alone, the appellate court has jurisdiction to find facts in accordance with its own view of the preponderance of the evidence. *Id.* "However, the abuse of discretion standard plays a role in the appellate review of a sanctions award." *Ex parte Gregory,* 378 S.C. 430, 437, 663 S.E.2d 46, 50 (2008). Where the appellate court agrees with the trial court's findings of fact, it reviews the decision to award sanctions under an abuse of discretion standard. *Id.* Under the abuse of discretion standard, the imposition of sanctions will not be disturbed on appeal unless the decision is controlled by an error of law or is based on unsupported factual conclusions. *Id.*

## LAW/ANALYSIS

Appellants argue the trial court erred in denying their motion for sanctions because (1) there were no good and reasonable grounds for the claims the Respondents withdrew;

(2) the remaining claims had no reasonable legal or factual basis; (3) Respondents failed to provide competent evidence of damages; (4) Respondents failed to provide any evidence of fraud; and (5) Respondents pursued the claim as one for breach of a merger for six years before abandoning that position at trial.[3] We disagree.

Appellants sought sanctions under Rule 11, SCRCP, and under the Act. The parties dispute the version of the Act that applies to this case. The Act was substantially revised by 2005 S.C. Laws Act 27, effective July 1, 2005. Under the former version of the Act, the party seeking sanctions had to prove the party sought to be sanctioned acted frivolously. *See Father v. S.C. Dep't of Soc. Servs.*, 353 S.C. 254, 259, 578 S.E.2d 11, 13 (2003) (interpreting the Act as requiring frivolity to impose sanctions). The revisions to the Act created a "reasonable attorney" standard to determine whether sanctions are warranted. S.C.Code Ann. § 15–36–10 (Supp.2010). The revised Act states the revisions apply to causes of action arising on or after July 1, 2005. 2005 S.C. Laws Act No. 27, § 5.

This action was filed in 2003, and Appellants moved for summary judgment on May 31, 2005. These activities predate the revisions to the Act. Respondents withdrew several causes of action on March 7, 2006; Judge Kemmerlin issued his order dismissing the remaining causes of action on April 8, 2009; and Appellants filed their motion for sanctions on April 17, 2009. These activities occurred after the revisions to the Act.

Appellants argue the revised Act applies in this case because their motion was filed after the revisions, and it is a violation of the Act to participate in the continuation of frivolous proceedings. *See* S.C.Code Ann. § 15–36–10(A)(4)(a)(iii) (Supp.2010) (providing an attorney may be sanctioned for filing a frivolous pleading, motion, or document if "a reasonable attorney presented with the same circumstances would believe that the procurement, initiation, continuation, or defense of a civil cause was intended merely to harass

---

3. We combine Appellants' arguments, finding that all relate to the issue on appeal argued as Appellants' sixth issue: Whether Judge Kemmerlin erred in denying sanctions.

or injure the other party"). Appellants rely on a footnote in *Rutland v. Holler, Dennis, Corbett, Ormond & Garner (Law Firm)*, 371 S.C. 91, 637 S.E.2d 316 (Ct.App.2006), to support their argument.

In *Rutland*, the trial court granted the defendants' motion to dismiss in a legal malpractice, breach of contract, and fraud action on August 9, 2004. *Id.* at 95, 637 S.E.2d at 318. On September 1, 2004, the defendants moved for attorney's fees and costs under the Act. *Id.* The trial court granted fees and costs by order dated September 20, 2005. *Id.* On appeal, this court noted the revisions to the Act became effective July 1, 2005, and stated: "Because [defendants] filed their motion on September 1, 2004, we believe the original Act still governed. . . . Moreover, [the plaintiff] does not challenge the applicability of the former Act." *Id.* at 95 n. 2, 637 S.E.2d at 318 n. 2.

Our supreme court has also recognized the revisions to the Act and applied "the law as it existed at the time judgment was entered" in utilizing the former version of the Act. *Russell v. Wachovia Bank, N.A.*, 370 S.C. 5, 17 n. 8, 633 S.E.2d 722, 728 n. 8 (2006); *but see Ex parte Gregory*, 378 S.C. 430, 432 n. 1, 663 S.E.2d 46, 48 n. 1 (2008) (finding the cause of action arose under the previous version of the Act without identifying the triggering event). However, the issue of the retroactive or prospective application of the Act was not litigated in either *Russell* or *Rutland.*

■■■ We, therefore, look to the general rules regarding the retroactive or prospective application of a statute. Absent a specific provision or clear legislative intent to the contrary, the general rule is that statutes are to be construed prospectively rather than retroactively, unless the statute is remedial or procedural in nature. *Bartley v. Bartley Logging Co.*, 293 S.C. 88, 90, 359 S.E.2d 55, 56 (1987). A statute is remedial where it creates new remedies for existing rights unless it violates a contractual obligation, creates a new right, or divests a vested right. *Smith v. Eagle Constr. Co.*, 282 S.C. 140, 143, 318 S.E.2d 8, 9 (1984). "[W]here a statute . . . creates new obligations [or] imposes a new duty . . . it will be construed as prospective only." 82 C.J.S. *Statutes* § 585 (2009).

We find guidance from the analysis employed by the District Court of Appeals of Florida in *Mullins v. Kennelly*, 847 So.2d 1151 (Fla.Dist.Ct.App.2003). In determining whether a newly enacted portion of Florida's sanctions act applied retrospectively or prospectively, the court followed the federal courts' view "that whether conduct should be sanctioned should be measured by the standard in effect at the time of the conduct to be sanctioned." *Id.* at 1154. The court opined: "We endorse that view because such an interpretation helps achieve the prophylactic goal of the statute, while not retroactively penalizing a party for actions that occurred, or papers that were filed, when the earlier version of [the statute] controlled." *Id.* at 1154–55.

We conclude the Act creates substantive rights and imposes new obligations by effectively changing the standard for imposing sanctions to a "reasonable attorney" standard. Therefore, the Act will apply prospectively absent clear indication to the contrary by the Legislature. In this case, the Legislature provided the revisions in the Act were to apply to causes of action arising on or after the effective date of the statute, July 1, 2005, and we find this indicates the Legislature did not intend retrospective application. Accordingly, we apply the Act as it existed prior to the revisions. *See generally Toth v. Square D Co.*, 298 S.C. 6, 8, 377 S.E.2d 584, 585 (1989) (stating judicial decisions which create liability where none previously existed must be given prospective application).

The Act provided for liability for attorney's fees and costs of frivolous suits. Section 15–36–10 of the Act provided:

Any person who takes part in the procurement, initiation, continuation, or defense of any civil proceeding is subject to being assessed for payment of all or a portion of the attorney's fees and court costs of the other party if: (1) he does so primarily for a purpose other than that of securing the proper ... adjudication of the claim upon which the proceedings are based; and (2) the proceedings have terminated in favor of the person seeking an assessment of the fees and costs.

S.C.Code Ann. § 15–36–10 (2005) (current version at Supp. 2010). Section § 15–36–20 [4] provided:

4. Sections 15–36–20 through –50 of the Act were repealed by 2005 S.C. Laws Act No. 27, § 12.

Any person who takes part in the procurement, initiation, continuation, or defense of civil proceedings must be considered to have acted to secure a proper purpose as stated in item (1) of Section 15–36–10 if he reasonably believes in the existence of the facts upon which his claim is based and

(1) reasonably believes that under those facts his claim may be valid under the existing or developing law; or

. . . . .

(3) believes, as an attorney of record, in good faith that his procurement, initiation, continuation, or defense of a civil cause is not intended to merely harass or injure the other party.

S.C.Code Ann. § 15–36–20 (2005) (repealed 2005).

Rule 11 of the South Carolina Rules of Civil Procedure also provides for sanctions and states in part:

(a) Every pleading, motion or other paper of a party represented by an attorney shall be signed in his individual name.... The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion or other paper; that to the best of his knowledge, information and belief there is good ground to support it; and that it is not interposed for delay.... If a pleading, motion, or other paper is signed in violation of this Rule, the court, upon motion or upon its own initiative, may impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, motion or other paper, including a reasonable attorney's fee.

Rule 11(a), SCRCP.

Prior to the revisions to the Act, the standard for sanctions under Rule 11 was essentially the same as that under the Act. *Father v. S.C. Dep't of Soc. Servs.*, 353 S.C. 254, 262, 578 S.E.2d 11, 15 (2003) (comparing the standard for a Rule 11 sanction—a frivolous filing or argument, or bad faith filing—with the Act's standard of frivolity). To be entitled to sanctions, the aggrieved party had to show that the party sought to be sanctioned acted frivolously. *Id.*

With the standard of frivolity in mind, we consider Respondents' argument that this court must affirm under *Hanahan v. Simpson,* 326 S.C. 140, 485 S.E.2d 903 (1997). In *Hanahan,* our supreme court reversed an award of sanctions under the previous version of the Act. *Id.* at 158, 485 S.E.2d at 913. The court stated: "[W]here a party survives a summary judgment motion, it is not subject to sanctions after a trial on the merits of the surviving claims." *Id.* The court considered that there is a split of authority as to whether sanctions may be awarded notwithstanding the denial of summary judgment. *Id.* at 157, 485 S.E.2d at 912. The court concurred with the view that "a party who survives pre-trial motions to dismiss and for summary judgment [is] not subject to sanctions after a trial on the surviving claims. The theory behind these cases is that if a case is submitted to the jury, it cannot be deemed frivolous." *Id.* (internal citations omitted).

Appellants argue *Hanahan* does not apply in this instance, despite the denial of summary judgment by two trial court judges, because the action was dismissed after the Respondents presented their case rather than going to the jury or trial judge after a full trial. We find *Hanahan* applies in this case. In denying summary judgment as to breach of contract, breach of contract accompanied by fraudulent act, and fraud, Judge Gregory found "a pretty good question of fact [as to] partial performance ... to take it out of the statute of frauds...." Judge Kemmerlin likewise refused to grant Appellants summary judgment before the start of trial. Judge Kemmerlin conducted the bench trial. After Respondents presented their case, Appellants requested the court allow them to get the transcript printed, and consider their motion to dismiss before presenting their case. The court granted the request. The court took the case under advisement and subsequently ruled. We find the rule in *Hanahan* applies in this case. Because Respondents survived summary judgment motions, they are not subject to sanctions. Furthermore, we find even if *Hanahan* did not apply in this case, because the trial court in essence granted a directed verdict after Respondents presented their case, Appellants have failed to show Respondents acted frivolously.

## CONCLUSION

Based on the foregoing analysis, the order on appeal is **AFFIRMED.**

HUFF and PIEPER, JJ., concur.