785 S.E.2d 600

Fred GATEWOOD, Appellant,

v.

SOUTH CAROLINA DEPARTMENT OF
CORRECTIONS, Respondent.

**Appellate Case No. 2014–001199.**

**No. 5389.**

Court of Appeals of South Carolina.

Heard Nov. 2, 2015.

Decided March 9, 2016.

Rehearing Denied June 2, 2016.

---

Douglas H. Westbrook, of Charleston, for appellant.

Lake Eric Summers, of Malone Thompson Summers & Ott, LLC, of Columbia, for respondent.

GEATHERS, J.

Appellant (Inmate), an inmate participating in a Prison Industries service project operated by Respondent South Carolina Department of Corrections (SCDC), challenges an order of the South Carolina Administrative Law Court (ALC) up-

holding SCDC's denial of Inmate's wage-related grievance.[1] Inmate argues the ALC erred in denying his motion to supplement the record. Inmate also argues the ALC erred in applying section 24-1-295 of the South Carolina Code (Supp. 2015) to determine the deductions from his gross wages. We affirm in part, reverse in part, and remand.

## FACTS/PROCEDURAL HISTORY

In 1995, our legislature enacted section 24-3-430 of the South Carolina Code (2007) to authorize the expansion of the Prison Industries program into the private sector. This expansion allowed qualified private entities to use inmate labor but required the wages for participating inmates to be no less than "the prevailing wage for work of [a] similar nature in the private sector." Act No. 7, 1995 S.C. Acts 78. Section 24-3-430 became effective on July 1, 1995. *Id.* at 102. Subsequently, on September 30, 1998, SCDC entered into a contract with Williams Technologies, Inc. (WTI) for the employment of SCDC inmates on the premises of Lieber Correctional Institution (Lieber) in WTI's business of "disassembly and/or remanufacturing of its product lines at [Lieber]." The cover page for the contract document is entitled "Williams Technology Transmissions Service Contract."

The contract's "Scope of Work" provision states, in pertinent part, "Prison Industry inmates under the general oversight of SCDC will disassemble and/or remanufacture [WTI's] product lines according to engineering design and manufacturing specifications developed and provided by [WTI]...." The contract also provides, "For all purposes, inmates shall be considered to be employees of SCDC." With regard to payment for services, the contract requires WTI to pay SCDC "$4.00 per hour per inmate for work performed[,] including

---

1. Inmate's case was one of 197 consolidated appeals from SCDC's denial of wage-related grievances. In *Ackerman v. S.C. Dep't of Corr.,* the ALC affirmed the denial of 196 of the grievances on the ground that they were not timely filed with SCDC and ordered Gatewood's appeal to be briefed on the merits. This court reversed the ALC's order affirming the denial of the other 196 grievances and remanded the case for consideration of these grievances on the merits. *Ackerman v. S.C. Dep't of Corr.,* 415 S.C. 412, 413, 782 S.E.2d 757 (2016).

training hours and hours in excess of the inmate's normal shift."

The payment provision further states,

SCDC shall be responsible to pay inmate workers, *cover security costs and [Prison Industries] overhead,* including any costs for health, safety and welfare of the inmates, taxes or other payroll deduction. . . .

Thirty (30) days prior to each anniversary date of this agreement, SCDC and [WTI] may negotiate an increase in the per hour rate paid by [WTI] to SCDC. If such an increase is requested, it shall be limited to a maximum of five percent (5%) annually or the annual percentage increase in the Consumer Price Index, whichever is lower. *It is the intent of the parties that such increase shall only reflect SCDC's increased costs of prison overhead.*

[WTI] and SCDC may mutually agree upon a bonus plan for inmates based on productivity and quality control. Such bonus will be paid in its entirety by [WTI] to SCDC for distribution to inmates.

(emphases added). The contract's cover page highlights the contract's "Requirements/Specifications," which include "Wage Rate: $4.00 per hour/per inmate; $.35/[hour] base for inmates." Also, the contract's terms concerning "Bonus Pay/Programs" indicate that the "starting base pay" for participating inmates is $0.35 per hour.

On July 20, 2001, the legislature enacted the first of a series of yearly budget provisos, effective for the fiscal year beginning July 1, permitting SCDC to pay participating inmates less than the prevailing wage for "service work": [2]

The Director of [SCDC] may enter into contracts with private sector entities that would allow for inmate labor to be provided for prison industry service work. The use of such inmate labor may not result in the displacement of employed workers within the local region in which work is being performed. Service work is defined as any work such as repair, replacement of original manufactured items, packaging, sorting, labeling, or similar work that is not original equipment manufacturing. *The department may negotiate*

---

**2.** The 2001–2002 budget was enacted on July 20, 2001, for the fiscal year beginning July 1, 2001.

*the wage to be paid for inmate labor provided under prison industry service work contracts, and such wages may be less than the prevailing wage for work of a similar nature in the private sector.*

H. 3687, Appropriation Bill 2001–2002, Part IB § 37.31 (Act No. 66, 2001 S.C. Acts 738) (emphasis added). The legislature enacted identical, or nearly identical, provisos for each following fiscal year until the 2007–2008 fiscal year, and on August 1, 2007, section 24–1–295 of the South Carolina Code, which codified the language in the provisos, became effective.[3] *See* S.C.Code Ann. § 24–1–295 (Supp.2015) ("[SCDC] may negotiate the wage to be paid for inmate labor provided under prison industry service work contracts and export work contracts, and these wages may be less than the prevailing wage for work of a similar nature in the private sector."). This legislation also established mandatory deductions from the "gross earnings of the inmates engaged in prison industry service work in addition to any other required deductions." *Id.*

Inmate began working under the WTI contract in 2004—he received his first paycheck on October 18, 2004, and he filed his "Step 1" Inmate Grievance Form with SCDC on this same date. In his grievance, Inmate requested the negotiated wage of $4.00 per hour. SCDC's Inmate Grievance System Policy, designated as Policy GA–01.12, provides for formal review of inmate complaints in two steps. A Step 1 grievance is evaluated by the prison's Warden, and any appeal from the Warden's decision to the "responsible official," is designated as

---

3. H. 4878, Appropriation Bill 2002–2003, Part IB § 37.25 (Act No. 289, 2002 S.C. Acts 3145); H. 3749, Appropriation Bill 2003–2004, Part IB § 37.23 (Act No. 91, 2003 S.C. Acts 1437); H. 4925, Appropriation Bill 2004–2005, Part IB § 37.23 (Act No. 248, 2004 S.C. Acts 2574); H. 3716, Appropriation Bill 2005–2006, Part IB § 37.22 (Act No. 115, 2005 S.C. Acts 1324); H. 4810, Appropriation Bill 2006–2007, Part IB § 37.22 (2006 Act No. 397); Act No. 68, 2007 S.C. Acts 288. The legislature sustained the Governor's veto of H. 3620, Appropriation Bill 2007–2008, Part IB § 37.21, the stated reason for the veto being, "the language is no longer necessary after I signed S. 182, the Prison Industries legislation. This proviso conflicts with the statutory changes and is unneeded." Therefore, from July 1, 2007 to August 1, 2007, there existed no authorization for SCDC to pay participating inmates below the prevailing wage. We address the import of this anomaly in section II of the Law/Analysis portion of this opinion.

"Step 2." The responsible official must render a decision on the appeal within sixty days, and this decision constitutes SCDC's final response in the matter.

On October 28, 2004, Lieber's Warden denied Inmate's Step 1 grievance. On November 8, 2004, Inmate filed his Step 2 Inmate Grievance Form, challenging SCDC's denial of the requested relief. On May 14, 2007, SCDC issued a final decision on Inmate's Step 2 grievance, basing its denial of relief on both the merits and the fifteen-day filing deadline set forth in paragraph 13.1 of Policy GA–01.12.[4] Inmate then appealed SCDC's decision to the ALC.

According to SCDC, Inmate received his last paycheck on April 13, 2009, during the pendency of his appeal to the ALC. On April 29, 2014, the ALC upheld SCDC's denial of Inmate's grievance on the ground that the deductions taken by SCDC from Inmate's gross wages were proper. This appeal followed.

### ISSUES ON APPEAL

1. Did the ALC err in denying Inmate's motion to supplement the record?

2. Did the ALC err in applying section 24–1–295 of the South Carolina Code (Supp.2015) rather than section 24–3–40 of the South Carolina Code (2007) to determine the deductions from Inmate's gross wages?[5]

3. Did the ALC err in holding that security and overhead constituted "other required deductions" for purposes of section 24–1–295?

4. Does section 24–1–295 apply retroactively to Inmate's pre-August 1, 2007 work?[6]

---

4. Paragraph 13.1 states, in pertinent part: "If informal resolution is not possible, the grievant will complete Form 10–5, Step 1 ... and will submit the Form to *an employee designated by the Warden* ... within 15 days of the alleged incident. *An inmate will submit a grievance within the time frames established in the policy.*"

5. Section 24–3–40 was amended in 2010; however, in no event would that amendment apply to Inmate because his last day of record working under the WTI contract was April 13, 2009.

6. We combine this issue with the due process issue listed in Inmate's brief. In light of our analysis of the due process issue, we need not

5. Did the ALC err in holding that the issue of overtime was not preserved for review?

6. Did the ALC err in denying Inmate's request for pre-judgment interest, post-judgment interest, costs, and attorney's fees?

7. Did the ALC err in declining to consider whether SCDC should process grievances for all inmates participating "in the program"?

8. Did the ALC err in declining to enjoin SCDC from further wage violations?

## STANDARD OF REVIEW

Section 1–23–610(B) of the South Carolina Code (Supp.2015) sets forth the standard of review when this court is sitting in review of a decision by the ALC on an appeal from an administrative agency. Here, there are no factual disputes. Rather, the issues on review involve questions of law. Therefore, our review of the ALC's decision is governed by item (d) of section 1–23–610(B), which allows this court to reverse the ALC's decision if it is affected by an error of law.

## LAW/ANALYSIS

### I. Motion to Supplement

 Inmate argues the ALC erred in denying his motion to supplement the record of the grievance proceedings before SCDC. We hold any error in denying the motion was harmless because Inmate's sole issue before the ALC was whether he was entitled to a wage of $4.00 per hour, a question of law not requiring review of Inmate's pay stubs and time cards, and Inmate's issues on appeal to this court are likewise issues of law. *See Judy v. Judy,* 384 S.C. 634, 646, 682 S.E.2d 836, 842 (Ct.App.2009) ("Error is harmless where it could not reasonably have affected the result of the trial."); *id.* ("Generally,

reach the issue concerning the impairment of contractual obligations. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address the remaining issues on appeal when resolution of a prior issue is dispositive).

appellate courts will not set aside judgments due to insubstantial errors not affecting the result.").

## II. Deductions

Inmate asserts the ALC erred in applying section 24–1–295 of the South Carolina Code (Supp.2015) to determine the deductions from his gross wages earned prior to August 1, 2007 because (1) the parties did not raise this issue in their briefs and (2) section 24–3–40 rather than section 24–1–295 applies to determine deductions from his gross wages earned prior to August 1, 2007. We agree with Inmate that section 24–3–40 governs deductions from his gross wages earned prior to August 1, 2007, but only as to the month of July 2007.

■ As to Inmate's assertion that the parties did not raise the issue of deductions before the ALC, we note that in his "Level Three Brief," Inmate requested the ALC to calculate his back wages at "$4.00 per hour, less any deductions under [section] 24–3–40(A) applicable to [Inmate]. . . . No deduction should be made from [Inmate's] gross wages unless expressly authorized by [section] 24–3–40. Any ambiguity should be construed in [Inmate's] favor." In its brief, SCDC argued that deductions for overhead and security costs were authorized by the WTI contract. In reply, Inmate argued that SCDC's overhead and other expenses were "not allowable deductions from an inmate's gross wages under [section] 24–3–40." Therefore, the parties clearly raised the issue of deductions in their briefs before the ALC, and the ALC properly addressed the deductions required by statute and by the WTI contract.

■ As to which statute determines the deductions to be taken from participating inmates' gross wages, the ALC concluded that section 24–3–40 does not apply "because the [WTI contract] was a service work contract, and deductions from wages resulting from service work provided to private industries by inmates is governed by [s]ection 24–1–295, not [s]ection 24–3–40." In evaluating this conclusion, we begin with a chronology of the legislation concerning deductions from an inmate's "gross wages," a/k/a "gross earnings."

In 2004, when Inmate began working under the WTI contract, two separate legislative enactments concerning deductions were in place: (1) section 24–3–40 and (2) the budget

proviso concerning "Prison Industry service work" accompanying the appropriation bill for fiscal year 2004–05. Section 24–3–40(A) states, "Unless otherwise provided by law, the employer of a prisoner authorized to work at paid employment in the community under Sections 24–3–20 to 24–3–50 *or in a prison industry program provided under Article 3 of this chapter* shall pay the prisoner's wages directly to [SCDC]." (emphasis added). The provisions in Article 3 of Chapter 3, in particular, S.C.Code Ann. § 24–3–430 (2007), created the Prison Industries program and established program standards. Further, section 24–3–40 requires SCDC to deduct the following amounts from the gross wages of an inmate: Twenty percent for court-ordered restitution or the State Office of Victim Assistance; thirty-five percent for any child support obligations; ten percent for the inmate's "purchase of incidentals"; ten percent for an escrow account "for the benefit of the prisoner"; and the "remaining balance" for federal and state taxes.

On the other hand, the proviso for fiscal year 2004–05 states, in pertinent part:

[T]he Director of [SCDC] shall deduct the following from the gross earnings of the inmates engaged in Prison Industry service work. (1) If *restitution* to a particular victim or victims has been *court ordered* [,] ... then *twenty percent (20%)* must be used to fulfill the restitution obligation. If restitution to a particular victim or victims has not been ordered by the court, or if court-ordered restitution to a particular victim or victims has been satisfied, then the ten percent (10%) [sic] must be applied to the South Carolina Victims' Compensation Fund. (2) *Ten percent (10%)* must be retained by the Department of Corrections to defray the *cost of the inmate's room and board.*

H. 4925, Appropriation Bill 2004–2005, Part IB § 37.23 (Act No. 248, 2004 S.C. Acts 2574) (emphases added).

Identical provisos accompanied the appropriation bills for fiscal years 2005–06, 2006–07, and 2007–08.[7] However, curiously, the legislature sustained the Governor's veto of the proviso for the 2007–08 fiscal year. *See supra* n. 3. The

---

7. *See* H. 3716, Appropriation Bill 2005–2006, Part IB § 37.22 (Act No. 115, 2005 S.C. Acts 1324); H. 4810, Appropriation Bill 2006–2007, Part

Governor's stated reason for the veto was "the language is no longer necessary after I signed S. 182, the Prison Industries legislation. This proviso conflicts with the statutory changes and is unneeded." The referenced legislation, S. 182, added section 24-1-295 to the South Carolina Code to codify the language in the provisos authorizing service work contracts and payment below the prevailing wage. The Governor signed the legislation adding section 24-1-295 to the Code on June 13, 2007, but it did not become effective until August 1, 2007. Therefore, there existed no authorization for SCDC to enter into service work contracts or to pay inmates below the prevailing wage from July 1, 2007 to July 31, 2007. *See* S.C. Const. art. IV, § 21 (granting the Governor the power to veto "one or more of the items or sections contained in any bill appropriating money" and still approve of the residue); *Amisub of S.C., Inc. v. S.C. Dep't of Health & Envtl. Control,* 407 S.C. 583, 593, 757 S.E.2d 408, 414 (2014) ("The Governor's line item veto is a negative power to void a distinct item."); *id.* at 595, 757 S.E.2d at 415 ("[T]he line item veto power is intended to be a negative power, the power to nullify, or at least suspend, legislative intent."); *S.C. Coin Operators Ass'n v. Beasley,* 320 S.C. 183, 187, 464 S.E.2d 103, 105 (1995) ("[T]he constitutional provisions [that] apply to bills appropriating money apply to the entire appropriations act."). Critically, this gap also left a void in deductions specific to service work contracts.

 The Governor's veto message indicates he was apparently unaware that section 24-1-295 became effective on August 1, rather than July 1, 2007, or that a gap in the authorization of the program would be created. However, this court may not consider the Governor's veto message and its effect on the legislature's subsequent action in determining legislative intent. *See Amisub,* 407 S.C. at 600, 757 S.E.2d at 417 (stating the Governor's veto message does not have the force of law because it is neither a legislative act nor an Executive Order and that to hold otherwise "would violate the separation of powers doctrine by altering the allocation of powers granted to the three branches of government by our state's constitution").

---

IB § 37.22 (2006 Act No. 397); Act No. 68, 2007 S.C. Acts 288; H. 3620, Appropriation Bill 2007–2008, Part IB § 37.21.

Accordingly, section 24–3–40 governed deductions from the gross earnings of inmates from July 1, 2007 until section 24–1–295 became effective on August 1, 2007. Section 24–1–295 requires the identical deductions required by section 24–3–40 but adds the language "in addition to any other required deductions," i.e., "The Director of [SCDC] shall deduct the following from the gross earnings of the inmates engaged in prison industry service work *in addition to any other required deductions....* "[8] S.C.Code Ann. § 24–1–295 (Supp.2015) (emphasis added).

In sum, the appropriation bills for the fiscal years 2004–05, 2005–06, and 2006–07 governed deductions from Inmate's gross earnings until the month of July 2007; during July 2007, section 24–3–40 governed deductions from the prevailing wage that should have comprised Inmate's gross earnings for that month. Therefore, SCDC was not entitled to deduct security

---

8. There exists an unsettled question as to the meaning of the term "gross wages," as used in section 24–3–40, and the term "gross earnings," as used in section 24–1–295. Although not raised as a separate issue in this appeal, before the ALC, the parties differed on whether the "gross wages," a/k/a "gross earnings," established by the WTI contract are represented by the rate of $4.00 "per hour per inmate," which WTI agreed to pay to SCDC for "work performed." Neither the term "gross wages" nor the term "gross earnings" is defined in Title 24 of the South Carolina Code. Inmate argued that the $4.00 rate represents gross wages, while SCDC argued that the rate of $0.35 indicated on the contract's "bullet sheet" represents gross wages. The ALC found the $4.00 rate to be Inmate's gross wages. While SCDC argues on page 21 of its brief before this court that the rate of $0.35 represents gross wages, it conceded in oral argument that the ALC's finding on Inmate's gross wages should be affirmed.

Our supreme court addressed the term "gross wages," as used in section 24–3–40, in *Torrence v. S.C. Dep't of Corr.*, 373 S.C. 586, 646 S.E.2d 866 (2007). In *Torrence*, the plaintiffs alleged that the private industry sponsor paid SCDC $7.17 per hour for inmate labor and SCDC improperly diverted $1.92 from this amount and deposited it into an agency "Surplus Fund" before paying the plaintiffs $5.25 per hour. 373 S.C. at 590, 646 S.E.2d at 867. The court stated in dictum, "[I]f appellants prove true their allegation that the SCDC removes any of the money remitted by the private industry sponsor and then disburses the percentages listed in section 24–3–40 based on the lower rate, the SCDC would be in violation of the plain language of the statute which directs it to disburse the money based on the gross wages." 373 S.C. at 594 n. 4, 646 S.E.2d at 870 n. 4. Therefore, the court viewed the amount paid by the industry sponsor to SCDC as the gross wages.

costs and overhead for July 2007. Finally, section 24–1–295 governed the deductions from Inmate's gross earnings from August 1, 2007 through April 13, 2009, the date Inmate received his last paycheck.

### III. Other Required Deductions

 Inmate asserts that the ALC erred in concluding that security costs and overhead constituted "other required deductions" for purposes of section 24–1–295. We disagree.

All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute. The Court should give words their plain and ordinary meaning without resort to subtle or forced construction to limit or expand the statute's operation. A statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers. In interpreting a statute, the language of the statute must be read in a sense which harmonizes with its subject matter and accords with its general purpose.

*State v. Sweat*, 386 S.C. 339, 350, 688 S.E.2d 569, 575 (2010) (citations omitted).

The ALC concluded SCDC's security costs and Prison Industries overhead constituted "other required deductions" for purposes of section 24–1–295 because they were built into the $4.00 per hour rate WTI agreed to pay to SCDC for inmate labor. We agree. The contract's payment provision states, in pertinent part, "Thirty (30) days prior to each anniversary date of this agreement, SCDC and [WTI] may negotiate an increase in the per hour rate paid by [WTI] to SCDC. . . . *It is the intent of the parties that such increase shall only reflect SCDC's increased costs of prison overhead.*" (emphasis added).

Further, the application of the language "other required deductions" from section 24–1–295 to the WTI contract is reasonable because it is consistent with: (1) the statute's opening provision allowing SCDC to "*enter into contracts* with private sector entities that allow inmate labor to be provided for prison industry service work" (emphasis added); (2) its subsequent provision stating that SCDC may "*negotiate* the

wage to be paid for inmate labor provided under prison industry service work *contracts....*" (emphases added); and (3) the legislative intent underlying the creation of the Prison Industries program.[9] These provisions necessarily imply that SCDC has the flexibility to determine the amount it will charge the industry sponsor to compensate SCDC for inmate labor and any other costs SCDC must incur to make this work available for eligible inmates. *See Sweat,* 386 S.C. at 350, 688 S.E.2d at 575 ("All rules of statutory construction are subservient to the one that the legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute." (quoting *Broadhurst v. City of Myrtle Beach Election Comm'n,* 342 S.C. 373, 380, 537 S.E.2d 543, 546 (2000))); *id.* ("A statute as a whole must receive a practical, reasonable, and fair interpretation consonant with the purpose, design, and policy of the lawmakers." (quoting *Browning v. Hartvigsen,* 307 S.C. 122, 125, 414 S.E.2d 115, 117 (1992))).

Based on the foregoing, the ALC did not err in concluding that security and overhead expenses constitute "other required deductions" for purposes of section 24–1–295.

## IV. Retroactive Application

Inmate maintains the ALC's retroactive application of section 24–1–295 to his wages earned prior to the effective date of section 24–1–295, August 1, 2007, violates his right to due

---

9. *See* S.C.Code Ann. § 24–3–310 (2007) ("Since the means now provided for the employment of [prison] labor is inadequate to furnish a sufficient number of [inmates] with employment, it is the intent of this article to: (1) further provide more adequate, regular, and suitable employment for the [inmates] of this State, consistent with proper penal purposes; (2) further utilize the labor of [inmates] for self-maintenance and for reimbursing this State for expenses incurred by reason of their crimes and imprisonment; (3) effect the requisitioning and disbursement of prison products directly through established state authorities with no possibility of private profits; and (4) provide prison industry projects designed to place inmates in a realistic working and training environment in which they are able to acquire marketable skills and to make financial payments for restitution to their victims, for support of their families, and for the support of themselves in the institution."); *State v. Prince,* 335 S.C. 466, 472, 517 S.E.2d 229, 232 (Ct.App.1999) ("[T]he court should not consider the particular clause being construed in isolation, but should read it in conjunction with the purpose of the whole statute and the policy of the law.").

process of law.[10] Inmate argues the statute's addition of "other required deductions" to the deductions previously required by section 24–3–40 reduced his net wages beginning on August 1, 2007, and applying this result retroactively would divest him of his right to certain wages that vested when they were earned prior to August 1, 2007. We agree.

*Preservation*

■ SCDC contends Inmate did not preserve the question of retroactivity for review because he did not raise it before the ALC. However, the ALC's conclusion that section 24–1–295 applies to Inmate's gross earnings implies section 24–1–295 operates retroactively, given that Inmate began working for the WTI project almost three years before section 24–1–295 became law. Further, the question of whether section 24–3–40 or section 24–1–295 applies to Inmate's gross wages fairly encompasses the question of whether 24–1–295 applies retroactively to the wages earned before the statute's effective date. Therefore, it is proper to address the issue on the merits.[11]

■ SCDC also argues Inmate did not raise his due process argument before the ALC, and, therefore, it is not preserved for review. We disagree. The question of whether applying a statute retroactively violates due process is fairly subsumed within the question of whether the statute in fact operates retroactively. In other words, the very standard for deter-

10. Amend. XIV, § 1, U.S. Const.; S.C. Const. Art. I, § 3. As a second ground for his argument that section 24–1–295 cannot operate retroactively, Inmate maintains retroactive operation of the statute would impair the obligations of the WTI contract. Because we agree with Inmate's first ground, we need not reach his second ground. *See Futch*, 335 S.C. at 613, 518 S.E.2d at 598 (holding an appellate court need not address the remaining issues on appeal when resolution of a prior issue is dispositive).

11. SCDC also contends the ALC did not apply section 24–1–295 retroactively to Inmate's wages earned prior to August 1, 2007, but rather concluded that security costs and overhead were contractually required deductions before section 24–1–295 was enacted. However, in its order, the ALC expressly stated that the deductions required by the WTI contract "constituted 'other required deductions' pursuant to [s]ection 24–1–295." The ALC further stated "Appellant was never entitled to actually receive $4.00 per hour for his labor, though that is the rate by which his gross wages were to be calculated for purposes of section 24–1–295."

mining whether a statute operates retroactively requires analyzing its potential to divest or limit a vested right. *See Dunham v. Davis,* 229 S.C. 29, 35, 91 S.E.2d 716, 718 (1956) (holding retroactive application of a statute relaxing the stringency of a tax sale procedure to respondents, whose rights in certain real property vested prior to the statute's enactment "would be clearly unconstitutional as depriving them of property without due process of law"); *see also Edwards v. State Law Enf't Div.,* 395 S.C. 571, 579, 720 S.E.2d 462, 466 (2011) ("[A]bsent a specific provision or clear legislative intent to the contrary, statutes are to be construed prospectively rather than retroactively, unless the statute is remedial or procedural in nature."); *Se. Site Prep, LLC v. Atl. Coast Builders & Contractors, LLC,* 394 S.C. 97, 106, 713 S.E.2d 650, 655 (Ct.App.2011) ("A statute is remedial where it creates new remedies for existing rights unless it violates a contractual obligation, creates a new right, or divests a vested right."); *Edwards,* 395 S.C. at 580, 720 S.E.2d at 467 ("[A] statute that limits a right is generally not procedural.").

*Merits*

Section 24–1–295 authorizes SCDC to "enter into contracts with private sector entities that allow inmate labor to be provided for prison industry service work and export work." The statute further authorizes SCDC to negotiate the wage to be paid for inmate labor at less than the prevailing wage and requires SCDC to deduct specified amounts from an inmate's gross earnings, "in addition to any other required deductions," for the following purposes: twenty percent for victim restitution;[12] thirty-five percent for the inmate's child support obligations, if any; ten percent for an inmate's purchase of incidentals; ten percent for an interest-bearing escrow account for the inmate's benefit; and the remaining balance for any federal or state taxes.[13] These specified amounts are identical to those required by section 24–3–40.

---

12. In the event there exists no court-ordered restitution or this obligation has already been satisfied, the twenty percent is required to be paid to the South Carolina Victim's Compensation Fund. S.C.Code Ann. § 24–1–295(2) (Supp.2015).

13. Any funds not used to pay these taxes "must be made available to the inmate for the purchase of incidentals." S.C.Code Ann. § 24–1–295(6) (Supp.2015).

■ "[A]bsent a specific provision or clear legislative intent to the contrary, statutes are to be construed prospectively rather than retroactively, *unless* the statute is remedial or procedural in nature." *Edwards*, 395 S.C. at 579, 720 S.E.2d at 466 (emphasis added). Therefore, it is necessary to determine whether the statute in question is remedial or procedural in evaluating the ALC's retroactive application of section 24–1–295 to Inmate's wages earned prior to August 1, 2007.

■ "A statute is remedial where it creates new remedies for existing rights *unless* it violates a contractual obligation, creates a new right, or *divests a vested right.*" *Se. Site Prep*, 394 S.C. at 106, 713 S.E.2d at 655 (emphases added). On the other hand, "a 'procedural' law sets out a mode of procedure for a court to follow, or 'prescribes a method of enforcing rights.'" *Edwards*, 395 S.C. at 580, 720 S.E.2d at 466 (quoting Black's Law Dictionary 1083 (1979)). However, "a statute that limits a right is generally not procedural." *Id.* at 580, 720 S.E.2d at 467. These standards for remedial and procedural statutes dovetail with Inmate's argument that retroactive application of section 24–1–295 violates due process by divesting his vested right to earn a certain net wage prior to the effective date of section 24–1–295. To evaluate this argument, we first examine Inmate's right to wages, then determine how the implementation of section 24–1–295 should have affected his net wages.

Prior to August 1, 2007, Inmate had a right to wages pursuant to (1) the budget provisos for fiscal years 2004–05, 2005–06, and 2006–07 and (2) as to July 2007, section 24–3–430(D) and section 24–3–315 of the South Carolina Code (2007). *See* H. 4925, Appropriation Bill 2004–2005, Part IB § 37.23 (Act No. 248, 2004 S.C. Acts 2574) (authorizing SCDC to negotiate the wage to be paid for inmate labor and requiring SCDC to deduct certain amounts from a participating inmate's gross wages, thus, implying a right to compensation); H. 3716, Appropriation Bill 2005–2006, Part IB § 37.22 (Act No. 115, 2005 S.C. Acts 1324) (same); H. 4810, Appropriation Bill 2006–2007, Part IB § 37.22 (2006 Act No. 397) (same); S.C.Code Ann. § 24–3–315 (2007) ("The director must determine prior to using inmate labor in a prison industry project that ... the rates of pay and other conditions of employment are not less than those paid and provided for work of similar nature in the locality in which the work is performed.");

S.C.Code Ann. § 24–3–430(D) (2007) ("No inmate participating in the program may earn less than the prevailing wage for work of similar nature in the private sector."); *Wicker v. S.C. Dep't of Corr.,* 360 S.C. 421, 424, 602 S.E.2d 56, 57 (2004) ("[W]here … the state has created a statutory right to the payment of a prevailing wage, it cannot thereafter deny that right without affording due process of law."). Further, Inmate's right to a certain wage became vested as soon as he earned that wage. *Cf. Bales v. Aughtry,* 302 S.C. 262, 264, 395 S.E.2d 177, 179 (1990) ("Leave benefits are part of compensation earned for services rendered and the right to receive that compensation vests once the services are rendered.").

Prior to the effective date of section 24–1–295, the appropriation bills for the fiscal years 2004–05, 2005–06, and 2006–07 governed deductions from Inmate's gross earnings until the month of July 2007; during July 2007, section 24–3–40 governed deductions from Inmate's gross earnings. When section 24–1–295 became effective, the "other required deductions" language supplemented those deductions already required by section 24–3–40. In other words, section 24–3–40 does not accommodate "any other required deductions." Unlike section 24–1–295, section 24–3–40 does not add such a catch-all phrase to the specifically enumerated deductions. Further, section 24–3–40 requires SCDC to use the balance remaining after all other listed deductions are taken to pay federal and state taxes, which reduces the participating inmate's tax debts. Therefore, the increase in deductions authorized by section 24–1–295 beginning on August 1, 2007, theoretically resulted in less net income to Inmate.[14]

Applying this increase in deductions retroactively to gross wages earned during July 2007 would divest Inmate's vested right to a higher net wage for that month, i.e., his gross wages less only those deductions authorized by section 24–3–40, and, therefore, would violate his due process rights.[15] *See Dunham,* 229 S.C. at 35, 91 S.E.2d at 718 (holding retroactive application of a statute relaxing the stringency of a tax sale

---

14. We use the word "theoretically" because it is likely that SCDC was already taking deductions for security costs and overhead from Inmate's gross wages.

15. Likewise, applying section 24–1–295 retroactively to Inmate's gross wages earned prior to July 2007, when the provisos for fiscal years

procedure to respondents, whose rights in certain real property vested prior to the statute's enactment "would be clearly unconstitutional as depriving them of property without due process of law"); *cf. Wicker*, 360 S.C. at 424, 602 S.E.2d at 57 ("[W]here . . . the state has created a statutory right to the payment of a prevailing wage, it cannot thereafter deny that right without affording due process of law."). Accordingly, section 24–1–295 is neither remedial nor procedural and operates prospectively only.

Based on the foregoing, we reverse the ALC's retroactive application of section 24–1–295 to Inmate's gross wages earned prior to August 1, 2007.

## V. Overtime

▮▮▮ Inmate contends the ALC erred in concluding that the issue of overtime pay was not preserved for its review. We disagree.

The ALC noted that Inmate did not request overtime pay in his Step 1 Inmate Grievance Form or his Step 2 form. The ALC also disagreed with Inmate's assertion that SCDC itself raised the issue in its Step 1 and Step 2 responses, referencing the following language from those responses: *"To the extent* that you demand overtime wages in your appeal or grievance, I conclude that neither *Adkins* nor *Wicker* . . . require SCDC to pay you or any other inmate in your position overtime wages for your prison industries labor during the time period you discuss in your Step 1 grievance." (emphasis added).[16] The ALC concluded that Inmate did not raise this issue in his grievance forms, and, therefore, "there was no extent to which [Inmate] demanded overtime wages. . . ."

▮▮▮ An issue that is not raised to an administrative agency is not preserved for appellate review by the ALC. *Cf. Kiawah Resort Assocs. v. S.C. Tax Comm'n*, 318 S.C. 502, 505, 458 S.E.2d 542, 544 (1995) ("In reviewing a final decision of an

---

2004–05, 2005–06, and 2006–07 would otherwise govern deductions, would violate due process to the extent that imposing the deductions authorized by section 24–1–295 would reduce Inmate's net wages from what they would have been as a result of taking the deductions allowed by the provisos.

**16.** *See Wicker*, 360 S.C. 421, 602 S.E.2d 56 (2004); *Adkins v. S.C. Dep't of Corr.*, 360 S.C. 413, 602 S.E.2d 51 (2004).

administrative agency under [S.C.Code Ann.] § 1–23–380, the circuit court essentially sits as an appellate court to review alleged errors committed by the agency. As such, the circuit court, like this [c]ourt, has a limited scope of review, and cannot ordinarily consider issues that were not raised to and ruled on by the administrative agency." (citations omitted)). Even if the issue has been addressed by the agency, it is not preserved if the appellant did not raise it. *Cf. Wierszewski v. Tokarick*, 308 S.C. 441, 444 n. 2, 418 S.E.2d 557, 559 n. 2 (Ct.App.1992) ("An issue is not preserved for appeal merely because the trial court mentions it."). In *Wierszewski*, the family court judge "suggested at the hearing that attorney's fees might be authorized under" a certain statute. *Id.* This court declined to address the point "because it was not raised in the petition or addressed in the order." *Id.*

Here, while the issue of overtime was addressed in SCDC's written determination, rather than merely in a hearing, the weight of authority concerning issue preservation requires an appellant to initiate consideration of the issue. *See, e.g., S.C. Dep't of Transp. v. First Carolina Corp. of S.C.*, 372 S.C. 295, 301, 641 S.E.2d 903, 907 (2007) ("[I]it is a litigant's duty to bring to the court's attention any perceived error, and the failure to do so amounts to a waiver of the alleged error."); *id.* at 301–02, 641 S.E.2d at 907 ("There are four basic requirements to preserving issues at trial for appellate review. The issue must have been (1) raised to and ruled upon by the trial court, (2) raised *by the appellant*, (3) raised in a timely manner, and (4) raised to the trial court with sufficient specificity." (emphasis added) (quoting Jean Hoefer Toal et al., *Appellate Practice in South Carolina* 57 (2d ed.2002))); *Mize v. Blue Ridge Ry. Co.*, 219 S.C. 119, 129–30, 64 S.E.2d 253, 258 (1951) (holding the trial court's discussion of a question in ruling on a directed verdict motion did not "have the effect of enlarging the grounds" on which the appellant made the motion); *McCall v. State Farm Mut. Auto. Ins. Co.*, 359 S.C. 372, 381–82, 597 S.E.2d 181, 186 (Ct.App.2004) (stating that the issue raised on appeal was raised to the trial court by the respondent, not by the appellant, and, therefore, the issue was not preserved for appellate review).

Based on the foregoing, the ALC properly declined to address the merits of Inmate's argument concerning overtime pay.

## VI. Interest, Costs, and Attorney's Fees

Inmate argues if he is the prevailing party, he is entitled to petition the ALC for costs and attorney's fees as well as pre- and post-judgment interest on any back wages due. Because we reverse the ALC's conclusion that section 24–1–295 applies to Inmate's gross earnings prior to August 1, 2007, we remand the issue of Inmate's entitlement to costs, attorney's fees, pre-judgment interest, and post-judgment interest to the ALC for reconsideration in light of this opinion.

## VII. Processing Grievances for All Participating Inmates

Inmate argues the ALC erred in declining to consider the issue of whether SCDC should be ordered to process grievances for other inmates participating "in the program" who did not file their own grievances. We disagree.

ALC Rules 51 through 66 govern "Special Appeals," i.e., "matters heard on appeal from final decisions pursuant to *Al-Shabazz v. State*, 338 S.C. 354, 527 S.E.2d 742 (2000)." ALC Rule 51. Specifically, ALC Rule 65 states, in pertinent part: "The Administrative Law Judge may affirm any ruling, order or judgment upon any ground(s) appearing in the Record and need not address a point which is manifestly without merit."

Appearing immediately after the text of Rule 65 are the following notes. While not having authoritative value, they are instructive: "Rule 65 incorporates the portion of Rule 220, SCACR, which allows the judge to affirm upon any ground appearing in the Record and *to decline to address points which are without merit.* Motions for reconsideration are not allowed." (emphasis added).

Inmate implies that the ALC could not rely on Rule 65 unless it expressly stated in its order that the issue was manifestly without merit. However, there is no indication in the ALC rules that an opinion must specifically state that an appellant's point is "manifestly without merit" in order to avoid addressing the point. Here, the ALC implicitly found the issue in question to be manifestly without merit, and we agree with that assessment. *See* Rule 220(b)(2), SCACR ("The Court of Appeals need not address a point which is manifestly without merit."); ALC Rule 65 ("The Administrative Law Judge ... need not address a point which is manifestly without merit.").

Based on the foregoing, the ALC did not err in declining to address the issue in question.

## VIII. Injunction

Finally, Inmate asserts the ALC erred in declining to entertain his request for an injunction against SCDC's future wage violations. We disagree and affirm the ALC on this issue. *See* Rule 220(b)(2), SCACR ("The Court of Appeals need not address a point which is manifestly without merit.").

## CONCLUSION

Accordingly, we reverse the ALC's conclusion that section 24–1–295 applies retroactively to Inmate's gross wages earned prior to August 1, 2007. We remand the issue of Inmate's entitlement to costs, attorney's fees, pre-judgment interest, and post-judgment interest to the ALC for reconsideration in light of this opinion. We affirm the ALC as to all other issues of this appeal.

**AFFIRMED IN PART, REVERSED IN PART, and RE-MANDED.**

SHORT and McDONALD, JJ., concur.